UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HO MYUNG MOOLSAN CO., LTD. and HYUN- SONG KANG,<br><br>            Plaintiffs,<br><br> -against-<br><br>MANITOU MINERAL WATER, INC., RAPHAEL DRUG AND HEALTH CO., O-YOON KWON, NAM-IN JHON, HANMI HOME SHOPPING COMPANY, NEW JERSEY FLEA MARKET NEWS, NEW YORK FLEA MARKET NEWS a/k/a WWW.FINDALLUSA.COM. JOHN DOES 1 THROUGH 10 AND JANE DOES 1 THROUGH 10 AND ABC COMPANIES 1 THROUGH 100,<br><br>            Defendants. | Case No. 07 CIV 7483<br><br>**AFFIDAVIT IN OPPOSITION AND IN SUPPORT OF CROSS-MOTION** |

STATE OF NEW YORK )
          )ss:
COUNTY OF NEW YORK )

   O-YOON KWON, being duly sworn, deposes and says:

   1.  I am one of the defendants in this action as well as the president of defendants Manitou Mineral Water, Inc. ("Manitou") and Raphael Drug & Health Ltd. ("Raphael") (named herein as Raphael Drug and Health Co.) and as such, I am fully familiar with the facts and circumstances of this action.

   2.  For the reasons set forth herein and in the accompanying Memorandum of Law, I respectfully submit that the plaintiffs' application for injunctive relief be denied in its entirety and that the defendants' cross-motion to dismiss as against your deponent, my pharmacy, Raphael, Manitou's employee, Nam-In Jhon, and the other defendants, be dismissed for failure to state a cause of action.

3. As I shall demonstrate hereafter, the plaintiffs' application should be denied for a variety of reasons. Among other things:

a. None of the agreements annexed to the plaintiffs' moving papers provide that the plaintiffs have an exclusive right to distribute the subject mineral water;

b. For some inexplicable reason, the plaintiffs fail to annex to their papers the actual contract executed by the plaintiffs and Manitou which specifically provides that "Global sales right will be discussed six months from now." (*see* Exhibit "A" hereto);

c. The plaintiffs rely on a "contract" (Exhibit 1 to plaintiffs' Order to Show Cause) which they acknowledge in a separate New Jersey Federal Court Complaint is a forgery (*see* Exhibit "N" hereto);

d. The plaintiffs drafted the subject agreement which should be strictly construed against them;

e. Defendant Manitou has continuously performed under its agreements, has never terminated same and wishes to continue to perform;

f. The plaintiffs totally ignore the fact that defendant Manitou's production was slowed in part due to Manitou's efforts to accommodate plaintiffs' post-contract request for the manufacture and shipment of a ½ liter size bottle of water in addition to the agreed upon size of one liter; and

g. All of the defendants who are non-signatories to the subject agreement should not be named as defendants in this action.

4. By way of background, Manitou began bottling mineral water in 2003. The

source of our spring water is the Manitou Springs in Colorado. Prior to our relationship with the plaintiffs, Manitou mineral water was being sold in Japan, Mexico and in the United States. It was by reason of our relationship with the plaintiffs that we sought to also distribute our water in South Korea.

5. Your deponent is the president and chief executive officer of Manitou and I possess a Ph.D. in pharmacology. One of our employees, defendant Nam-In Jhon, likewise holds a Ph.D. in chemistry and he is in charge of our Colorado facility.

6. In addition to my role as an officer of Manitou, I am also a pharmacist licensed by the State of New York. I am also the president of defendant Raphael which operates a retail pharmacy at 1257 Broadway, New York, New York. My pharmacy is a separate and distinct business which has absolutely no relationship to Manitou's operations and accordingly, it should not be named herein as a defendant.

7. Manitou's dealings with the plaintiffs began indirectly in or about 2004. In that regard, I was introduced to a Mr. Young Gil Jee who, as the plaintiffs' moving papers state at paragraph 16 thereof, was the undisclosed "then-employee and confidant" of plaintiff Hyun-Song Kang.

8. Contrary to what is asserted at paragraph 19 of the plaintiffs' moving papers, Mr. Jee neither paid $2,000,000 for the "exclusive water supply business" nor executed the one page "contract" with Manitou that is appended to the plaintiffs' moving papers as Exhibit "1" thereto. Moreover, contrary to what is asserted at paragraph 19 of the plaintiffs' moving declaration, all of the contracts executed by Manitou were prepared by the plaintiffs and not by your deponent or any of the defendants.

9. So there is no misunderstanding, the purported "contract" annexed to the plaintiffs' moving papers as Exhibit "1" thereto is a forgery and does not contain my signature. Moreover, as I shall demonstrate later on, the plaintiffs know that this "contract" is a forgery based on the allegation contained in their recently filed New Jersey Federal Complaint against Mr. Jee (Exhibit "N" hereto). The actual contract signed by your deponent as president of Manitou and by Mr. Jee (with a certified court translation thereof) is annexed hereto as Exhibit "B".

10. While there are similarities between the two documents, there are also significant differences. In the first place, neither agreement provides that Manitou was giving Mr. Jee the "exclusive" right to distribute Manitou's water. In that regard, the certified translations of the actual agreement executed by your deponent and Mr. Jee as well as a certified translation of the forged document (Exhibit "C" hereto) indicate at paragraph 1 thereof that Mr. Jee was only given a right to distribute Manitou's water; no exclusivity was granted in either contract.

11. The actual agreement executed by your deponent and Mr. Jee also provides at paragraph 2 thereof that Mr. Jee was paying $500,000 for the distribution rights and an advance payment of $1,000,000 for the purchase of water. Paragraph "3" then provides that Mr. Jee was to make a $100,000 down payment and the 1.4 million dollar balance would be paid by December 23, 2004. Thus, the numbers add up to $1.5 million dollars which Manitou acknowledges receipt thereof.

12. On the other hand, the numbers contained in the forged document (Exhibit "1" to plaintiffs' Order to Show Cause) do not add up. In that regard, the translation annexed to the plaintiffs' moving papers make reference to an advance payment of $1,000,000 and an additional $1,000,000 to be paid in advance to purchase mineral water. Paragraph "3" then refers to a $100,000 deposit with the $1,800,000 balance due by December 23, 2004. These numbers are also reflected

in the Korean version of the purported contract which is annexed to plaintiffs' moving papers as Exhibit "1" thereto.

13. As the Court will note, a $100,000 down payment of the purported $2,000,000 due under the fraudulent agreement would have left a balance of $1,900,000; not $1,800,000. This only further supports my contention that the document annexed to plaintiffs' declaration as Exhibit "1" is a forgery.

14. In 2005 I located the plaintiff Korean corporation which I subsequently learned was Mr. Jee's principal. I spoke with plaintiff Mr. Hyun-Song Kang who inquired as to how much Manitou had been paid by Mr. Jee and I indicated that we had received $1,500,000. Mr. Kang then showed me the document with my forged signature (plaintiffs' Exhibit "1") and I informed him that it was not the document that we had executed. I immediately took a copy of the forged agreement and I subsequently sued Mr. Jee in both the Korean and New York State courts. We subsequently resolved our dispute by way of an agreement that I reached with Mr. Jee in which he executed a document dated November 25, 2005 by which he "abandons" the "wholesaler contract" which he had previously reached with Manitou. (See "Memorandum of Abandonment" dated November 25, 2005 with translation thereof, annexed hereto as Exhibit "D".)

15. For some inexplicable reason, the plaintiffs rely on the forged contract (Exhibit 1 to plaintiffs' Order to Show Cause) although it has sued Mr. Jee in Federal Court in New Jersey based on his fraudulent actions.

16. More specifically, in its New Jersey Federal Complaint which was filed on August 21, 2007 (Exhibit "N" hereto), plaintiffs assert at paragraph 23 thereof that Mr. Jee had used a "dual-contract means to obtain a financial gain from the plaintiffs" by entering into the fraudulent

contract (Exhibit 1 to plaintiffs' Federal New Jersey Complaint). In that regard, plaintiffs assert at paragraph 20 in their complaint that the same fraudulent contract (Exhibit 1 to plaintiffs' Order to Show Cause herein) provides that Jee was to pay me $1,000,000 for the right to purchase my water an additional $1,000,000 to me as a prepayment for the water.

17. Plaintiffs then claim at paragraphs 23-24 of their New Jersey Complaint that they eventually learned of the actual complaint I signed with Jee (Exhibit "3" to plaintiffs' New Jersey Complaint and Exhibit "B" hereto) which provides that the total to be paid to me was $1,500,000, not $2,000,000. Thus, the plaintiffs claim that Jee "embezzled the difference of $500,000 (paragraph 24 to Exhibit 1 of plaintiffs' New Jersey Federal Complaint).

18. Given the fact that the plaintiffs knew of the forgery, it goes without saying that it is bizarre that they would rely on it in this case and claim that its my actual agreement with Jee (*see* paragraph 12 of plaintiffs' moving declaration) while at the same time they fail to attach to their moving papers herein the actual contract with Jee and the contract Manitou subsequently signed with them. Clearly, the plaintiffs are not being straight forward with this Court.

19. In that regard, following the resolution of Manitou's matters with Mr. Jee, on or about December 1, 2005, Manitou did execute an agreement directly with the plaintiff corporation, a copy of which is annexed hereto as Exhibit "A". As noted above, for some inexplicable reason, this agreement is not contained in the plaintiffs' moving papers.

20. Once again, while there are similarities with respect to the actual agreement executed by Manitou with Mr. Jee (Exhibit "B" hereto), there are significant differences. Perhaps this explains why the plaintiffs chose not to reveal this agreement to the Court.

21. In the first place, paragraph "1" of the agreement indicates that plaintiff Ho

Myung Moolsan Co., Ltd. was only receiving a right to sell Manitou's water; no reference is made to an "exclusive" right.

22. Of particular significance is that paragraph "2" of our agreement provides as follows: "Global sales right will be discussed 6 months from now. However, there is no amount change." Thus, contrary to what the plaintiffs are asserting, it is clear that the plaintiffs were not given any exclusive rights and any assertion to the contrary should be given short shrift.

23. The agreement goes on to reflect the payment of $1,500,000 as is reflected in Mr. Jee's actual agreement which he previously had entered into with Manitou (See Exhibit "B" hereto). While the agreements anticipate the purchase of Manitou's bottle for $1 per 1 liter bottle, the agreements annexed to the plaintiffs' moving papers as Exhibits "1" and "2" refer to a five year agreement and require the purchaser to order more than $1,000,000 per year from "2 years after starting the business". The agreement that was executed by the plaintiff corporation and Manitou, however, provides for a five year agreement and that: "after <u>one year</u> from the business commencement, order for $1,000,000 or more must be placed, each year." (Exhibit "A")(<u>emphasis added</u>).

24. Notwithstanding the foregoing, the parties did in fact begin doing business and bottles of mineral water began being shipped to the plaintiff corporation in 2006. In that regard, annexed hereto as Exhibit "E" is a copy of a list created by the plaintiff which reflects the shipments to the plaintiff commencing on or about May 15, 2006 and continuing through and including April 2, 2007, totaling 307,032 bottles of water.

25. As the Court will note, there was a continuous flow of water from Manitou

to the plaintiff for a period of approximately one year. Problems subsequently developed in 2007, however, for a variety of reasons.

26. In the first place, an apparent misunderstanding arose concerning an alleged order for eight containers of water which, I might note, was inconsistent with the prior orders that had been placed by the plaintiff during our course of dealings.

27. More specifically, on May 30, 2007, the plaintiff contacted our Colorado factory and inquired as to the status of a prior order of eight containers of water (*See*, Exhibit "F"). By fax dated June 1, 2007 (See Exhibit "G" hereto), defendant Jhon requested that the plaintiff: "please new order for eight containers that you said not delivered because it is uncertain of order sheet of eight containers. Send a fax to the factory and formal order sent to New York by written documents."

28. In response to the foregoing, by fax letter dated June 5, 2007 (Exhibit "H" hereto), the plaintiff faxed a request for eight containers of water and indicated that: "hoping date of delivery: 7-05-07".

29. In addition, a subsequent order was placed by the plaintiff for two additional containers by fax letter dated July 6, 2007 with a proposed date of delivery of "8-6-07" (Exhibit "I" hereto).

30. Notwithstanding the significant order that had been placed by the plaintiff which was well in excess of what Manitou had previously shipped to plaintiff, we nevertheless endeavored to fulfill the plaintiff's request. A problem developed, however, due to the fact that the plaintiff had previously requested that in addition to the shipment of one liter bottles, we should also begin manufacturing and shipping ½ liter size bottles for sale in Korea.

31. In order to produce a ½ liter size bottle, Manitou ordered a new bottling system (at a cost of approximately $200,000) which was capable of manufacturing both ½ liter and one liter bottles. Clearly, the delay in receiving and installing this equipment in order to accommodate the plaintiff's request was something that neither side had anticipated when we signed our contract. In any event, the plaintiff should have cooperated with Manitou since our installation of this new equipment had been undertaken solely at its request.

32. The foregoing is confirmed in part by the aforesaid fax from the plaintiff to our Colorado facility dated May 30, 2007 (Exhibit "F" hereto). As the Court will note, in addition to making reference to an order for eight containers of water, the plaintiff notes in its fax as follows: "I want to use a 0.5 liter water bottle for marketing source; send a photo of 0.5 liter producing system machine now made."

33. By fax letter dated August 29, 2007 (Exhibit "O" hereto), Manitou informed the plaintiff that the new production line, which would be producing both size bottles, was unexpectedly delayed but that we could nevertheless resume deliveries the following week. We also indicated that we would be forwarding the requested photos to the plaintiff.

34. Unfortunately, instead of permitting us to continue shipping the requested order, on August 30, 2007 we received a letter from the plaintiffs' attorneys indicating that all communications concerning this matter should be directed to him in writing (Exhibit "M").[1]

35. As the foregoing indicates, Manitou was ready, willing and able to ship water to the plaintiff pursuant to the agreement of the parties. It should be noted, however, that there is

---

[1] It should be noted that as per the plaintiffs' affidavits of service (Exhibit "J" hereto), the plaintiffs' moving papers were purportedly served on August 30, 2007.

absolutely no basis for the plaintiffs' application to enjoin Manitou from continuing to distribute its water to whomever it wishes to. Indeed, as noted above, the agreement which was executed by the plaintiffs and Manitou, which the plaintiffs inexplicably failed to append to their papers (Exhibit "A" hereto) provides at paragraph "1" thereof that the plaintiff corporation had a right to sell Manitou's water. Absolutely no reference, however, is made to "exclusivity". More importantly, paragraph "2" of our agreement provides as follows: "Global sales right will be discussed 6 months from now. However, there is no amount to change."

36.    Thus, based upon paragraphs "1" and "2" of our agreement of December 1, 2005, it is clear that no exclusive right to distribute Manitou's water was granted to the plaintiffs and accordingly there is no basis for granting the plaintiffs' application which seeks in part to enjoin Manitou from selling its mineral water.

37.    The plaintiff attempts to suggest that Manitou was incapable of fulfilling its obligations by reason of the fact that it lacked "operational funds", as purportedly asserted in a letter dated January 10, 2007 by one of our employees, defendant Jhon (Exhibit "5" to plaintiffs' Order to Show Cause).

38.    In the first place, it should be noted that notwithstanding Mr. Jhon's concerns for our production line, the plaintiffs' order list annexed hereto as Exhibit "E" demonstrates that Manitou continuously shipped water to the plaintiff and in fact made eleven more shipments through and including April 2, 2007. Each shipment consisted of one container or 16,632 bottles of water. Thus, contrary to what the plaintiff asserts, we continued to fulfill our obligations long after Mr. Jhon's letter.

39. In any event, Mr. Jhon's letter makes reference to a variety of problems that we had encountered such as bad weather due to the snow in Colorado in December and the fact that some of our staff had gone on Christmas vacations, thus slowing production somewhat. Mr. Jhon also states in his letter "with present equipment and staff [Manitou] can easily produce 100,000 bottles in one month. But even if one thing makes trouble, can't do anything at all." While heavy snow and weather as well as financing can always pose a problem, we nevertheless continued to ship water to the plaintiff and, as reflected in the plaintiffs' attached order list (Exhibit "E") and the correspondence, we continued to meet our obligations.

40. The plaintiffs' claims at ¶ 28 of their moving affidavit that Defendants Hanmi Home Shopping Company and New York Flea Market News a/k/a www.findallusa.com are attempting to sell our water, are likewise unfounded.

41. In that regard, as reflected in the accompanying affidavit of Mr. Myung Suk Lee, the owner of the Korean American Times, he and his publications have never been compensated by your deponent and/or Manitou with respect to the distribution of water. More specifically, we have no agreements with respect to the aforesaid defendants to sell Manitou's water and we have never paid them in connection with the distribution of our water.

42. Mr. Lee and I know each other for approximately five years, after having met at the Korean American Chamber of Commerce of New York. I am the former president and Mr. Lee is the current president of that organization which has several hundred members.

43. After Mr. Lee and I became friendly, Mr. Lee attempted to help me market my water.

44. More specifically, in May of 2007, an exhibition of various companies was

-11-

sponsored by the Korean American Chamber of Commerce and your deponent made a presentation concerning our mineral water at 4:00p.m. (See p. 6 of annexed exhibition brochure annexed hereto as Exhibit "K"). It should be noted that other businesses participated in this exhibition, which included health related products and food products.

45. We had also shipped approximately five boxes of water (60 bottles) to Mr. Lee and he voluntarily advertised our water in his newspaper under the name "Hanmi Home Shopping Company". If anyone telephoned him with an interest in our product, as a favor to me, he would introduce the caller to Manitou and give away a free sample to all those who inquired. Simply put, no commercial relationship existed between us.

46. Moreover, as reflected in Mr. Lee's affidavit, the website referred to in the newspaper is the website address for the Korean American Times classified ads and does not involve the sale of products such as mineral water.

47. Finally, so there is no misunderstanding, Manitou is not infringing upon any of the plaintiffs' trademarks and, in fact, the bottles of water which were advertised in Mr. Lee's Korean American Times which are appended to plaintiffs' moving papers were the wrong photographs. Annexed hereto as Exhibit "L" is a copy of the July 27, 2007 Korean American Times and at page 25 thereof is a full page advertisement of Manitou's mineral water. As the Court will note, the advertised bottle is not the one reflected in the plaintiffs' moving papers. Thus, any mistake that was made in that regard was quickly corrected.

WHEREFORE, based upon the foregoing and for the reasons set forth in the accompanying Memorandum of Law, it is respectfully requested that the plaintiffs' application be denied in its entirety and that the defendants' cross-motion to dismiss for failure to state a cause of action be

granted in its entirety, together with such other and further relief as this Court deems just and proper.

_____
O-YOON KWON

Sworn to before me this
1st day of ~~September~~ October 2007.

_____
Notary Public

ANDREW A. KIMLER
Notary Public, State of New York
No. 01KI4658850
Qualified in New York County
Commission Expires 09/30/2009

-13-