UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HO MYUNG MOOLSAN CO., LTD. and
HYUN- SONG KANG,

                                        Plaintiffs,

            -against-

MANITOU MINERAL WATER, INC., RAPHAEL DRUG
AND HEALTH CO., O-YOON KWON, NAM-IN JHON,
HANMI HOME SHOPPING COMPANY, NEW JERSEY
FLEA MARKET NEWS, NEW YORK FLEA MARKET
NEWS a/k/a WWW.FINDALLUSA.COM. JOHN DOES 1
THROUGH 10 AND JANE DOES 1 THROUGH 10 AND
ABC COMPANIES 1 THROUGH 100,

                                        Defendants.

Case No. 07 CIV 7483 (RJH)

---

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION AND IN SUPPORT OF CROSS-MOTION TO DISMISS

.

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT.........................................................................................................1

POINT I

        THE PLAINTIFFS HAVE FAILED TO SATISFY THE
        REQUIREMENTS FOR INJUNCTIVE RELIEF......................................................1

POINT II

        PLAINTIFFS' FIRST AND SECOND CAUSES OF
        ACTIONS FOR DECLARATORY JUDGMENT AND
        FOR BREACH OF CONTRACT SHOULD BE DISMISSED
        AS AGAINST ALL DEFENDANTS EXCEPT AS TO
        DEFENDANT MANITOU MINERAL WATER, INC..........................................7

POINT III

        PLAINTIFFS' FOURTH CAUSE OF ACTION FOR TORTIOUS
        INTERFERENCE MUST BE DISMISSED FOR FAILURE TO
        STATE A CAUSE OF ACTION..............................................................................9

POINT IV

        PLAINTIFFS' FIFTH CAUSE OF ACTION FOR "FRAUD
        IN THE INDUCEMENT" MUST BE DISMISSED FOR
        FAILURE TO STATE A CAUSE OF ACTION.......................................................10

POINT V

        PLAINTIFFS' SIXTH CAUSE OF ACTION FOR CONSPIRACY
        MUST BE DISMISSED AS A MATTER OF LAW..............................................11

CONCLUSION............................................................................................................................11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HO MYUNG MOOLSAN CO., LTD. and
HYUN- SONG KANG,

                                                    Plaintiffs,

            -against-

MANITOU MINERAL WATER, INC., RAPHAEL
DRUG AND HEALTH CO., O-YOON KWON, NAM-IN
JHON, HANMI HOME SHOPPING COMPANY, NEW
JERSEY FLEA MARKET NEWS, NEW YORK FLEA
MARKET NEWS a/k/a WWW.FINDALLUSA.COM.
JOHN DOES 1 THROUGH 10 AND JANE DOES 1
THROUGH 10 AND ABC COMPANIES 1 THROUGH
100,

                                                    Defendants.

Case No. 07 CIV 7483 (RJH)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION AND IN SUPPORT OF CROSS-MOTION TO DISMISS

### Preliminary Statement

This Memorandum of Law is submitted in opposition to the plaintiffs' application for injunctive relief and in support of the defendants' cross-motion to dismiss portions of the complaint. The pertinent facts are set forth in the accompanying affidavit of defendant O-Yoon Kwon sworn to on October 1, 2007 and the affidavit of Myung Suk Lee sworn to on September 27, 2007.

### POINT I

### THE PLAINTIFFS HAVE FAILED TO SATISFY THE REQUIREMENTS FOR INJUNCTIVE RELIEF

As reflected in the plaintiffs' supporting Memorandum of Law, the "essence" of the plaintiff's claims are that they were "granted the exclusive right to distribute 'Manitou Springs'

brand water throughout the United States and Korea from the core defendants" and that the "core defendants have breached the contract between the parties by failing to supply the necessary products to plaintiff." (*see* pages 1-2 of plaintiffs' Memorandum of Law). It is also asserted that the "core defendants have further breached the contract by permitting the secondary defendants . . . to sell plaintiffs' water supply. . . ." (*see* plaintiffs' Memorandum of Law at page 2). The documentary evidence submitted in opposition to the plaintiffs' application, however, undermines all of the plaintiffs' assertions and demonstrates that the plaintiffs have not been forthcoming with the Court with respect to the underlying documents.

Generally speaking: "A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995). There are additional considerations, however, in connection with applications for injunctive relief. For example, courts have denied applications for a preliminary injunction where "a review of the involved hardships and equities did not disclose a balance favoring injunctive relief." *Jacobson & Company, Inc. v. Armstrong Cork Company*, 548 F.2d 438, 442 (2d Cir. 1977). Moreover, while the typical preliminary injunction is "prohibitory and generally seeks only to maintain the status quo pending a trial on the merits", a "mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Tom Doherty Associates, Inc., supra* at 34. Thus, the Second Circuit has held that "a mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result

from a denial of preliminary relief'" and that an "injunction going beyond preservation of status quo requires 'a more substantial showing of likelihood of success'". *Tom Doherty Associates, Inc., supra* at 34. The plaintiffs herein, however, have failed to satisfy any of the foregoing standards.

In the first place, the equities clearly do not balance in favor of the plaintiffs since they have blatantly misrepresented to this Court which agreements are the operative documents in this matter. Indeed, as reflected in the affidavit of defendant Kwon, the plaintiffs rely on a purported "contract" (Exhibit "1" to plaintiffs' Order to Show Cause) while at the same time they have acknowledged in a pending New Jersey Federal Court action that the same document is a forgery. More specifically, in the plaintiffs' New Jersey Federal Complaint which was filed on August 21, 2007 (Exhibit "N" to Kwon affidavit in opposition), plaintiffs assert at paragraph "23" thereof that Mr. Jee had used a "dual-contract means to obtain a financial gain from the plaintiffs" by entering into a fraudulent contract (Exhibit "1" to plaintiffs' Federal New Jersey Complaint). In that regard, plaintiffs' assert at paragraph "20" of their New Jersey Complaint that the same fraudulent contract (Exhibit "1" to plaintiffs' Order to Show Cause herein) provides that Jee was to pay defendant Kwon a total of $2,000,000 for the acquisition of Manitou's water.

Plaintiffs then claim at paragraphs "23-24" of their New Jersey Complaint that they eventually learned of the actual contract Mr. Kwon signed with Jee (Exhibit "3" to plaintiffs' New Jersey Complaint and Exhibit "B" to Kwon affidavit) which provides that the total to be paid to Manitou was $1,500,000; not $2,000,000. Thus, the plaintiffs' claim that Mr. Jee "embezzled the difference of $500,000" (paragraph "24" to Exhibit "1" of plaintiffs' New Jersey Federal Complaint).

The plaintiffs have also failed to annex to their moving papers the actual contract executed by them and defendant Manitou which specifically provides that: "Global sales right will

be discussed 6 months from now." (*see* Exhibit "A" to Kwon affidavit). Clearly, plaintiffs' knowing use of a forgery coupled with their failure to reveal the aforesaid documents to this Court is most telling. Indeed, these acts alone provide a separate basis for denying the plaintiffs the equitable relief that they seek.

In addition, the documents appended to defendant Kwon's affidavit also demonstrate that there is literally no basis for plaintiffs' contention that they possess an exclusive right to distribute Manitou's water or that Manitou refused to perform under its agreement. In that regard, as noted above, the actual agreement between the parties (Exhibit "A" to defendant Kwon's affidavit) totally contradicts plaintiffs' contention that they have the "exclusive" right to distribute the subject water since it provides that: "Global sales right will be discussed 6 months from now." Accordingly, the plaintiffs are not entitled to an injunction which prohibits Manitou from distributing its water to whomever it wishes to, as plaintiffs have not demonstrated a "likelihood of success on the merits" or that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Tom Doherty Associates, Inc., supra* at 33.

Likewise, the plaintiffs have failed to demonstrate that they are entitled to a mandatory injunction compelling defendant Manitou to ship its water to the plaintiffs. As noted above, the Second Circuit has held that "an injunction going beyond preservation of status quo requires 'a more substantial showing of likelihood of success'". *Tom Doherty Associates, Inc., supra* at 34. In the instant matter, it is clear that the plaintiffs have failed to make a "substantial showing of likelihood of success" on the merits. In that regard, they have not only relied upon a document which they have acknowledged in the New Jersey Federal action is a forgery, but they have also failed to append to their papers the actual agreement of the parties. Moreover, while the plaintiffs

-4-

assert that defendant Manitou refused to ship water to them and that Manitou was incapable of fulfilling its obligations by reason of the fact that it lacked "operational funds" (*see* paragraph "26" of plaintiffs' moving declaration), the documents appended to the Kwon affidavit demonstrate otherwise. In that regard, the plaintiffs' rely on a letter dated January 10, 2007 by one of Manitou's employees, defendant Jhon (Exhibit "5" to plaintiffs' Order to Show Cause), to support their contention that defendant Manitou was incapable of fulfilling its obligations. The plaintiffs' order list annexed to the Kwon affidavit as Exhibit "E" thereto, however, demonstrates that notwithstanding Mr. Jhon's January 10, 2007 letter and his concerns expressed therein, Manitou continuously shipped water to the plaintiff and in fact made eleven more shipments through and including April 2, 2007. Thus, contrary to what the plaintiffs assert, the plaintiffs' own order list confirms that Manitou continued to ship water to them for several months following Mr. Jhon's letter of January 10, 2007.

In addition, Manitou encountered some delay in shipping the requested water to the plaintiffs by reason of the fact that the plaintiffs had requested that Manitou begin manufacturing and shipping ½ liter size bottles for sale in Korea, notwithstanding the fact that the underlying agreement of the parties only refer to one liter size bottles (s*ee* Kwon affidavit at paragraph "30" and Exhibit "A" thereto). Mr. Kwon notes that in order to produce a ½ liter size bottle, Manitou ordered a new bottling system (at a cost of approximately $200,000) which was capable of manufacturing both size bottles. He also notes that the delay in receiving and installing this equipment in order to accommodate the plaintiffs' request was something that neither side had anticipated when the parties executed their agreement (*see* paragraph "31" of Kwon opposition affidavit).

With respect to the foregoing, it goes without saying that: "[I]mplied in every

-5-

contract. . . there is a duty of cooperation on the part of both parties. Thus, whenever the cooperation

of the promisee is necessary for the performance of the promise, there is a condition implied that the

cooperation will be given." *Lowell v. Twin Disc Inc.,* 527 F.2d 767, 770 (2d Circuit 1975).

Moreover, it has been held that: "a party to a contract is under an implied obligation to cooperate in

its performance, and cannot take advantage of an obstacle to performance which it has created or

which lies within its power to remove." *Murphy v. North American Co.,* 24 F. Supp. 471, 478

(S.D.N.Y. 1938). Indeed, "where one of the parties to a contract makes performance by the other

materially more difficult or expensive, the latter will be discharged." *United States v. Bedford

Associates,* 548 F.Supp. 732, 737 (S.D.N.Y. 1982). Clearly, the plaintiffs "cannot take advantage of

an obstacle to performance" which they created (requesting the manufacture of ½ liter size bottles)

which, as Mr. Kwon has demonstrated, made Manitou's performance more difficult to achieve.

Thus, any delay engendered by reason of the installation of new equipment for the production of both

½ liter and one liter bottles stems from the plaintiffs' request to modify the contract.

In addition, Mr. Kwon notes that in or about June and July of 2007, the plaintiffs sent

orders for approximately ten containers of water, which orders were significantly greater than those

previously placed by the plaintiff (paragraphs "28" and "30" of Kwon opposition affidavit). While

Mr. Kwon asserts that Manitou was attempting to fulfill these inordinately large orders, it should be

emphasized that Manitou's efforts to fulfill them were not mandated by law. In that regard, N.Y.

U.C.C. § 2-306(1) provides as follows:

> "A term which measures the quantity by the output of the seller or the
> requirements of the buyer means such actual output or requirements
> as may occur in good faith, except that no quantity unreasonably
> disproportionate to any stated estimate or in the absence of a stated
> estimate to any normal or otherwise comparable prior output or

requirements may be tendered or demanded"[1]

Clearly, based upon a review of the plaintiffs' own order list (*see* Exhibit "E" to defendant Kwon's affidavit), the significant orders that Manitou received in or about June and July of 2007 for ten containers of water were not "otherwise comparable" to that which was previously placed by them. Notwithstanding same, however, prior to the service of the plaintiffs' moving papers and complaint, by fax letter dated August 29, 2007 (Exhibit "O" to Kwon affidavit), Manitou informed the plaintiff that the new production line, which would be producing both size bottles, was unexpectedly delayed but that Manitou would nevertheless resume deliveries the following week (*see* paragraph "33" of Kwon affidavit in opposition). Thus, it is clear that defendant Manitou was prepared to fulfill its obligations and accommodate plaintiffs' requests.

## POINT II

### PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTIONS FOR DECLARATORY JUDGMENT AND FOR BREACH OF CONTRACT SHOULD BE DISMISSED AS AGAINST ALL DEFENDANTS EXCEPT AS TO DEFENDANT MANITOU MINERAL WATER, INC.

The plaintiffs' first cause of action seeks declaratory judgment. In that regard, paragraph "34" of the Complaint provides that: "[P]laintiffs' seek a determination that their exclusive rights under the contract prepared by the factory defendants [Kwon and Manitou as per paragraph "28" of Complaint] in this action have been violated. . . ." *(see*, Complaint, copy annexed hereto). The plaintiffs' second cause of action seeks damages for "breach of supply agreement under

---

[1] New York substantive law clearly applies in this case for two reasons. Firstly, at paragraph "12" of the complaint, it is asserted that: "Venue is proper in this district because significant events arose in this district." Moreover, the plaintiffs' brief relies largely on the substantive law of New York State. *See, Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir. 1984)("Moreover in the absence of a strong countervailing public policy, the parties to a litigation may consent by their conduct to the law to be applied.")

state law" and asserts that defendants Kwon and Manitou Mineral Water, Inc. breached the contract between them and the plaintiffs. (*see* paragraph "36" of Complaint, annexed hereto).

Generally speaking, when considering a Rule 12(b)(6) dismissal, the Courts "accept the facts alleged in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 196 (2d Cir. 2005). In *Broder*, the Second Circuit also noted as follows: "We are not limited solely to the allegations of the complaint, however, where a plaintiff has 'reli[ed] on the terms and effect of a document in drafting the complaint' and that document is thus 'integral to the complaint' we may consider its contents even if it is not formally incorporated by reference." *Broder, supra* at 196. In the instant matter, it is clear that the plaintiffs' contract claims, which are reflected in both their first and second causes of action, lie only against the signatory to the subject agreement, that being defendant Manitou. For example, Rule 12(b)(6) relief has been granted because "a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *See, Yucyco, Limited v. Republic of Slovenia,* 984 F. Supp. 209, 216 (S.D.N.Y. 1997). More significantly, however, since defendant Kwon executed all of the underlying agreements as president of Manitou Mineral Water, Inc. *(see, e.g.,* Exhibit "1" to annexed Complaint and Exhibit "A" to defendant Kwon's opposition affidavit), there is no basis for imposing personal liability upon him. *See also, Gold v. Royal Cigar Co., Inc.*, 105 A.D.2d 831, 832, 482 N.Y.S.2d 32, 33 (2d Dept. 1984)("As each document was executed by the individual defendant in his corporate capacity, they cannot form a basis for personal liability upon him.")

Based upon the foregoing, it is clear that but for the claims made against defendant Manitou, all claims against defendant Kwon and the other defendants herein with respect to the first

-8-

and second causes of action must be dismissed.

## POINT III

### PLAINTIFFS' FOURTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE MUST BE DISMISSED FOR FAILURE TO STATE A CAUSE OF ACTION

Plaintiffs' fourth cause of action which is entitled, "Tortious interference" asserts that "all defendants have committed one or more act of tortious interference with plaintiffs' business rights; with plaintiffs' contractual rights; and with plaintiffs' legal rights, causing significant damages." (*see* paragraph "42" of Complaint, annexed hereto). A claim for "[t]ortious interference with contract requires th existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82 (1996). In the instant action, the plaintiffs' complaint essentially consists of allegations concerning breach of contract arising out of defendant Manitou's alleged refusal to sell water to the plaintiffs (*see, e.g.,* paragraph "22" of complaint"); that the defendants' "fraudulently induced plaintiffs to invest almost $2,500,000 in . . .[the] venture. . ." (*see* paragraph "27" of complaint); and that the "factory defendants" Kwon and Manitou have permitted secondary sellers to sell the mineral water in violation of plaintiffs' alleged "exclusive rights." (*see* paragraph "28" of complaint). None of the allegations in the complaint, however, assert that any of the defendants had knowledge of a "valid contract between the plaintiff and a third party" and that the defendants intentionally procured a third party's breach of said contract without justification which resulted in the "actual breach of the contract" and "damages resulting therefrom." *Lama Holding Co., supra,* at 424, 82. In the absence

of any such allegations, the plaintiffs' fourth cause of action for "tortious interference" must be dismissed.

## POINT IV

### PLAINTIFFS' FIFTH CAUSE OF ACTION FOR "FRAUD IN THE INDUCEMENT" MUST BE DISMISSED FOR FAILURE TO STATE A CAUSE OF ACTION

The elements of claim for fraud or fraudulent inducement under New York law are: "(1) that defendant made a material false representation (2) with the intent to defraud the plaintiff, (3) the plaintiff reasonably relied upon the representation and (4) the plaintiff suffered damage as a result of that reliance." *Unicredito Italiano Spa v. J.P.Morgan Chase Bank, J.P.,* 288 F.Supp 2d, 485, 497 (S.D.N.Y. 2003). *See also, Hangzhou Silk Import and Export Corp. v. P.C.B. International Industries, Inc.,* 2002 WL 2031591 (S.D.N.Y.)(the allegations of fraud in the inducement must be plead "with specificity.")

It is clear from the complaint herein that the plaintiffs' claim fails to assert fraud in the inducement with any specificity. In addition, plaintiffs' complaint does not assert that any of the defendants made any material false representations to the plaintiffs, with the intent to defraud the plaintiffs, and that the plaintiffs reasonably relied upon same. In that regard, paragraphs "16-18" of the complaint specifically assert that the original discussions, negotiations and contract took place between Manitou and Mr. Jee. Indeed, at paragraphs "17 and 18" of the complaint, it is asserted that defendant Kwon executed the subject agreement as "president" of Manitou and that Mr. Jee executed the contract as "director" of the "Journalist Federation of Korea" which the plaintiffs assert is "a position unrelated to this matter." *(see* paragraph "14" of the complaint). Besides the fact that the purported agreement that the plaintiffs' complaint refers to (Exhibit "1" thereto) is a forgery, as noted

-10-

by the plaintiffs in their New Jersey Federal Court Complaint, the assertions in their complaint herein

clearly demonstrate that at no time did any of the defendants and, in particular, Mr. Kwon, make any

representations to any of the plaintiffs since Mr. Kwon was only dealing with Mr. Jee in his capacity

as the "director with the Journalist Federation of Korea." Under such circumstances, it cannot be

asserted that defendant Kwon (or any other defendant for that matter), made any material false

representations to the plaintiffs with the intent to defraud them since the complaint asserts that Mr.

Kwon believed that he was dealing with Mr. Jee who was apparently "the director of the Journalist

Federation of Korea." Thus, the plaintiffs fifth cause of action for fraud in the inducement must be

dismissed.

## POINT V

## PLAINTIFFS' SIXTH CAUSE OF ACTION FOR CONSPIRACY MUST BE DISMISSED AS A MATTER OF LAW

At paragraph "48" of the complaint, the plaintiffs assert:

All defendants have conspired among themselves and with other parties not joined in this action to damage plaintiffs by selling falsely branded products, inferior products or otherwise unlawful products infringing upon plaintiffs' proprietary and contractual rights, defendants are jointly and severally liable for civil conspiracy to violate the laws cited above, to the same extent as any other defendant.

The aforesaid cause of action, however, must be dismissed since: "New York does

not recognize an independent tort of conspiracy." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401

(2d. Cir. 2006).

## CONCLUSION

Based upon the foregoing, it is respectfully requested that the plaintiffs' application

-11-

for injunctive relief be denied and that the defendants cross-motion to dismiss portions of the

complaint be granted in its entirety, together with such other and further relief as this Court deems

just and proper.

Dated: Lake Success, New York
      October 1, 2007

                                        Respectfully,

                                        By: Andrew A. Kimler, Esq. (AK-9861)
                                        CAPELL VISHNICK LLP
                                        Attorneys for Defendants
                                        3000 Marcus Avenue, Suite 1E9
                                        Lake Success, New York 11042
                                        (516) 437-4385

JUDGE HOLWELL    07 CIV 7483

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MICHAEL S. KIMM, ESQ.
190 MOORE STREET, SUITE 272
HACKENSACK, NEW JERSEY 07601
TEL: 201-342-3377
FAX: 201-342-0555
*Attorney for Plaintiffs*

RECEIVED
AUG 2 3 2007
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| HO MYUNG MOOLSAN CO., LTD.,<br>and HYUN-SONG KANG, : | 07 CV _____ |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| MANITOU MINERAL WATER, INC., :<br>RAPHAEL DRUG AND HEALTH CO. :<br>O-YOON KWON; NAM-IN JHON, :<br>HANMI HOME SHOPPING COMPANY, ;<br>NEW JERSEY FLEA MARKET NEWS, :<br>NEW YORK FLEA MARKET NEWS, :<br>a/k/a WWW.FINDALLUSA.COM :<br>JOHN DOES 1 THROUGH 10, :<br>JANE DOES 1 THROUGH 10, and :<br>ABC COMPANIES 1 THROUGH 100, :<br>:<br>Defendants. : | **Complaint for damages with jury demand** |

## PRELIMINARY STATEMENT

Plaintiffs Ho Myung Moolsan Company, Limited, and Hyun Song Kang, for their complaint against the above-named defendants, state upon knowledge, except where indicated otherwise, as follows:

1

## THE PARTIES

1. At all relevant times, plaintiff Ho Myung Moolsan Company, Limited, was and still is an entity organized and existing under Korean law and as its principal place of business at #654-85 Deung-chun-dong, Gang-seo County, Seoul, Korea.

2. At all relevant times, plaintiff Hyung Song Kang was and still is an individual having a residence and domicile in Seoul, Korea, c/o #654-85 Deung-chun-dong, Gang-seo County, Seoul, Korea.

3. At all relevant times, defendants represented that defendant O Yoon Kwon (Kwon) resides at 118 East 60th Street, Apatmentn 14H, New York, New York 10022, and has held himself out as "president" of defendant Manitou Mineral Water, Inc.

4. At all relevant times, upon information, defendants represented that Manitou Mineral Water, Inc. (MMWI), was and is a company lawfully orgnized under New York law, with its principal place of business at 1257 Broadway, New York, New York 10001. Upon information and belief, defendant MMWI owns, leases or otherwise claims to hold a right to operate a spring water production plant at a location known as 1310 Manitou Avenue, Manitou Springs, Colorado 80829.

5. At all relevant times, defendants represented that, MMWI was and is a company operating in concert and participation with defendant Kwon's previous business and occupation as a pharmacist and operating a pharmacy known as Raphael Drug and Health (Raphael) at 1257 Broadway, New York, New York 10001. At all relevant times, defendants

2

represented that MMWI and Raphael shared a common telephone number 212-684-0090 and a common fax number 212-629-4749.

6. At all relevant times, defendants represented that defendant Nam In Jhon (Jhon) is a "relative" of defendant Kwon and is the "Factory Manager" at the Manitou Springs location of defendant MMWI at 1310 Manitou Avenue, Manitou Springs, CO.

7. At all relevant times defendant Hanmi Home Shopping Company is believed to be a New York entity having an address at 33-70 Prince Street, Suite 704, Flushing, New York 11354; and is engaged in the unlawful sale of "Manitou Springs Mineral Water" using plaintiffs' brand, labels, and using advertising materials that are virtually identical to plaintiffs' advertising and promotional materials. Hanmi Home Shopping Company is believed to be one of numerous distributors to whom the leading defendants (Kwon and his company) purportedly "granted" rights which are under the exclusive contractual rights of plaintiffs.

8. At all relevant times defendant New York Flea Market News, also known as www.findallusa.com, is believed to be a New York entity having an address at 33-70 Prince Street, Suite 704, Flushing, New York 11354; and is engaged in the unlawful sale of "Manitou Springs Mineral Water" using plaintiffs' brand, labels, and using advertising materials that are virtually identical to plaintiffs' advertising and promotional materials. New York Flea Market News and/or www.findallusa.com, is believed to be one of numerous distributors to whom the leading defendants (Kwon and his company) purportedly "granted"

3

rights which are under the exclusive contractual rights of plaintiffs.

9. At all relevant times defendant New Jersey Flea Market News, also kno vn as www.findallusa.com, is believed to be a New Jersey entity having an address at 438 3road Avenue, Suite 2, Palisades Park, New Jersey 07650; and is engaged in the unlawful s ale of "Manitou Springs Mineral Water" using plaintiffs' brand, labels, and using adver ising materials that are virtually identical to plaintiffs' advertising and promotional materials. New Jersey Flea Market News and/or www.findallusa.com, is believed to be one of num erous distributors to whom the leading defendants (Kwon and his company) purportedly "gra nted" rights which are under the exclusive contractual rights of plaintiffs.

10. At all relevant times, defendants John Does 1 through 10; Jane Does 1 throug h 10; and ABC Companies 1 through 100 are companies who are believed to exist, but whos : true identities are presently unknown to plaintiff. These individuals are believed to have conspired, and acted in further of such conspiracy, to commit violations of law aξainst plaintiff substantially in the manner set forth below.

## JURISDICTION AND VENUE

11. The Court has jurisdiction based on the basis of federal-question under 28 U.S.C. §§ 1331 as it involves federal-question matters. This Court also has jurisdiction und er 28 U.S.C. 1332(a) as the parties are citizens of different countries and the amount in contro rersy exceeds $75,000.00 exclusive of costs and interest. To the extent diversity jurisdict on is inapplicable, the Court has has supplemental jurisdiction over the state-law claims und er 28

4

U.S.C. § 1367.

12. Venue is proper in this district because significant events arose in this district.

## PERTINENT FACTS

### BACKGROUND

13. This case involves a fraudulent "foreign investment" scheme committed by defendants, acting individually, jointly and in concert and participation with others not named in this case, to induce plaintiff to invest approximately $2 million using materially false, willful, deliberate, malicious and wanton representations, acts and omissions.

14. The parties' business relationship began in June 2004, when plaintiff Hyun Song Kang (Kang) was introduced to defendant Kwon' "Manitou Springs" mineral water business by Kang's then-agent and confidant, Young Gil Jee (Jee). At that time, defendant Young Gil Jee was a Director of the Korean Journalists Federation, a position unrelated to this matter, and was also an advisor and agent, owing a fiduciary duty, to plaintiff Kang.

15. Plaintiff Hyun Song Kang is a business person in Korea with significant business accomplishments and engagements. Currently, he is Chairman of five separate business entities including a cosmetics manufacturer/distributor named Hwajin Cosmetics Co., Ltd., with a direct-person sales network of 70,000 agents; an entertainment television production studio known as "Gayo TV," which serves the Republic of Korea having a population of approximately 45 million persons. Plaintiff Kang is the sole shareholder of plaintiff Ho Myung Moolsan Co., Ltd.

5

16.  Upon information and belief, Young Gil Jee perceived that his princip; l and businessman, plaintiff Hyun Song Kang, could be induced to "invest" a certain sum of money.   At all relevant times, Young Gil Jee represented that an individual known as O Yoon Kwon resides at 118 East 60th Street, Apartment 14H, New York, New York 1 )022, and was and is "president" of a company known as Manitou Mineral Water, Inc., which owned the exclusive rights to the land that produced Manitou Springs mineral water, at the historic spring in Colorado, and that he, Young Gil Jee, would obtain a contract for b :nefit of plaintiff Kang to sell mineral water throughout the world.

17.  Subsequently, plaintiffs, through Jee, paid $2 million towards the contract f >r the exclusive water supply business.   In December 2004, the parties executed a one page "Contract" prepared by defendants.   Exhibit 1.

18.  The signatories to the "Contract" were defendant Kwon, who held himself out as "President" of defendant Manitou Mineral Water, Inc., and Young Gil Jee, who was a Director with the Journalist Federation of Korea, and also served as an agent of plaintiff for this business.   Jee executed a simultaneous contract assigning the rights to plaintiffs.

19. Between August 2004 and March 2005, plaintiffs allocated for disbursement by Jee, and Jee paid the money required to obtain the exclusive rights to the Manitou Springs mineral water supply business from Manitou Mineral Water, Inc., and Kwon.   By the following year, March 2006, plaintiffs incurred approximately $2.5 million in the acquisition cost and operational expenses to establish the distributorship in the United States and Korea,

6

the initial launch markets, and to engage in marketing studies of other global market:.

20. During this process, on or about March 22, 2005, plaintiff organize1 and established a local business office for the sale and distribution of the "Manitou Spiings" brand water throughout the United States. Plaintiff was to directly handle the impor ation and distribution of "Manitou Springs" water products throughout Korea.

21. Between 2005 and 2006, plaintiff also expended significant expenses to organize a marketing campaign, including television advertisements; newspapers and other print advertisements; direct-to-consumer marketing campaign through tens of thousan1s of network members in Korea. Plaintiff developed  trademarks and logos including their "HMA" logo/mark, shown at Exhibit 2. Plaintiffs also developed for their exclusiv: and sole use, branding labels for the water bottle in two separate forms, annexed hereto as E: hibit 3 and Exhibit 4. Plaintiffs established a business entity; retained professionals and 1ired employees to perform the contract for water supply.

22. These efforts established a business goodwill that grew significantly throu;hout 2006 and approached at a high stage in 2007, when the mineral water sales under the "HMA" brand became aggressive. It was at this stage that plaintiffs' business operations were suddenly interrupted by the factory-defendants' refusal and failure to continue the supply of water.

23. Each container of shipment of water bottles from the Colorado factory consisted of 16,632 bottles per container. As of April 2, 2007, having shipped plaintiffs with a st pply

7

of only 307,032 bottles of water (less than 19 containers), defendants stopped shipping

further water supplies altogether to plaintiffs; and plaintiffs began suffer from the sudden

drop in the supply, after plaintiffs' extensive marketing efforts had created a substantial

customer base and demand in the marketplace.

24. Under the pre-paid terms of the supply agreement, whereby plaintiffs prepaid $1

million, plaintiffs were to receive an initial 1 million bottles delivered to Korea. Defendants

unilaterally, without justification terminated the supply after filling only 30 percent of the

prepaid volume, and breached the balance of the contract, and thereby placed plaintiffs in

jeopardy of losing business goodwill and their customer base.

25. Plaintiffs' efforts to secure further compliance with the contractual requirements

to continue the water supply — with $1 million prepaid for the supply — was rebuffed and

evaded by defendants, who claimed that they did not have adequate "operational funds" to

keep the Colorado factory in constant operations.

26. In January 2007, defendant Jhon wrote plaintiffs and purported to lament that the

operational funds were so lacking at Manitou Mineral Water, Inc., that they always cut of

some supply or other. If they had bottles, they claimed not to have labels; if they had labels

they claimed not to have bottles. The Jhon letter to Mrs. Jeong Hee Kim, president of Ho

Myung Moolsan, claimed that, without alerting the principal defendants, Kwon and his

company, Manitou Mineral Water, Inc., plaintiffs somehow fund the defendants' factory

operations by sending $50,000.00 per month. Defendant Jhon thereby suggested that

plaintiffs would have to effectively fund the continued operations of the water supply factory. The full text of the Jhon letter is annexed hereto as Exhibit 5.

27.  After fraudulently inducing plaintiffs to invest almost $2.5 million in a venture that now was characterized as "non-operational due to financial inadequacy," defendant next engaged in a palpable violation of plaintiffs' exclusive contractual rights and plaintiffs' trademark and trade dress rights.

28.  The factory defendants (Kwon; Manitou Mineral Water, Inc.) permitted secondary sellers to not only sell the "Manitou Springs" mineral water in violation of plaintiffs' exclusive rights.  In addition, the factory defendants permitted other defendants to use and exploit the "HMA" logo and trademark and plaintiffs' labels in advertisements which appeared in the interstate commerce.  One group of such defendants is Hanmi Home Shopping Company, which is owned or operated in conjunction with New York Flea Market News, which is also known as www.findallusa.com, a website selling various goods and services, allegedly throughout the United States.

29.  In various full-page advertisements, including the July 6, 2007, edition annexed hereto as Exhibit 6, defendants Hanmi and New York Flea Market News claimed to sell "Ho Myung America" or "HMA" brand "Manitou Springs" mineral water through the New York metro area and throughout the United States.

30.  After plaintiffs were saddled with the investment money that was used to acquire or maintain the production rights to the "spring," the factory defendants willfully,

9

maliciously, and callously ignored their contractual and legal obligations; turned about face and began to sell unknown volumes of the mineral water to various third-party entities and persons.

31. Defendants' acts and omissions were willful, wanton, deliberate and malicious and significant punitive damages are warranted against them, jointly and severally.

## CLAIMS FOR RELIEF

### Count One – Declaratory Judgment

32. Paragraphs 1 through 31 are incorporated by reference.

33. Plaintiffs hold the exclusive rights to the "Manitou Springs" mineral water supply business through an exclusive agreement with defendants Kwon and his company, Manitou Mineral Water, Inc. That exclusive agreement has been fully funded and there has been no grounds for terminating or avoiding the obligations and duties arising from that agreement. Despite these facts, defendants have failed to implement the terms of the agreement and have taken steps to circumvent the plaintiffs' exclusive rights by (1) failing to ship water supply to plaintiffs and (2) instead selling the water supply to third-parties who have no such contractual rights.

34. By reason of these facts, there exists a dispute concerning the distribution rights to the "Manitou Springs" mineral water supply, and plaintiffs seek a determination that their exclusive rights under the contract prepared by the factory defendants in this action have been violated, under 28 U.S.C. § 2201, causing significant damages.

10

### Count Two – Breach of supply agreement under state law

35. Paragraphs 1 through 31 are incorporated by reference.

36. By reason of those acts, defendants Kwon and Manitou Mineral Water, Inc., have repeatedly breached the contract between them and plaintiffs for the "Manitou Springs" mineral water supply, causing significant damages.

### Count Three – Unfair Competition Under the Lanham Act

37. Paragraphs 1 through 31 are incorporated by reference.

38. By reason of those acts, <u>all defendants</u> have engaged in trademark infringement, unfair competition, and/or false labeling, and have thereby violated the Lanham Act, 15 U.S.C. § 1101 et seq., causing significant damages.

### Count Three – Palming off

39. Paragraphs 1 through 31 are incorporated by reference.

40. By reason of those facts, <u>all defendants</u> have been unlawfully palming off plaintiffs' property rights under the common law, causing significant damages.

### Count Four – Tortious interference

41. Paragraphs 1 through 31 are incorporated by reference.

42. By reason of those facts, all defendants have committed one or more act of tortious interference with plaintiffs' business rights; with plaintiffs' contractual rights; and with plaintiffs' legal rights, causing significant damages.

### Count Five – Fraud in the inducement

11

43. Paragraphs 1 through 31 are incorporated by reference.

44. At the early stages of this venture, when plaintiffs had not committed their finances, their non-monetary resources, and their efforts to the establishment of the "Manitou Springs" mineral water business, defendants stated, warranted and represented that they had already obtained the water-supply rights from the Town of Manitou Springs, and that they were fully capable of providing as much water as plaintiffs required for sale and distribution anywhere including the United States and Korea.

45. Subsequently, as plaintiffs invested funds, time and efforts to establishing plaintiffs' business goodwill, in reliance upon defendants' acts, statements, and inducements, plaintiffs came to learn, from defendants' contrary statements and actions, that they did not have a water production plant that was viable, either financially or operationally. Defendants intentionally, deliberately, willfully, and maliciously withheld such information despite their knowledge or were recklessly indifferent to such knowledge of operational disruption. The acts, statements, and inducements made at the early stages were materially false, and the false statements and representations were used to induce plaintiffs' reliance and investment in defendants' business.

46. Plaintiffs reasonably and justifiably relied upon defendants' acts, statements, and inducements and have been seriously damaged. Accordingly, defendants are liable for fraud in the inducement of the contract.

12

## Count Six – Conspiracy to violate the law

47. Paragraphs 1 through 46 are incorporated by reference.

48. All defendants have conspired among themselves and with other parties not joined in this action to damage plaintiffs by selling falsely-branded products, inferior products, or otherwise unlawful products infringing upon plaintiffs' proprietary and contractual rights, defendants are jointly and severally liable for civil conspiracy to violate the laws cited above, to the same extent as any other defendant.

WHEREFORE, plaintiff demands:

(A) provisional and final injunction prohibiting defendants and anyone acting in concert or participation with them from discarding or destroying any evidence relating to the conduct of business relating to the "Manitou Springs" mineral water supply;

(B) provisional and final injunction against defendants' bad faith and dishonest attempt to terminate plaintiffs' business activity and plaintiffs' business goodwill;

(C) compensatory damages;

(D) punitive damages;

(E) attorney's fees and costs; and

(F) any other relief the Court deems just and proper.

13

## JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial
by jury.

Dated: August 20 2007                                Respectfully,

                                                     /s/ Michael S. Kimm

                                                     Attorney for plaintiffs

14

# Exhibit 1

# CONTRACT

This contract has been agreed made between O Yoon Kwon ("Party A"), president of Manitou Mineral Water, and Young Gil Jee ("Party B"), director of Journalists Federation of Korea, in regards to sales of Manitou Springs Mineral Water.

Manitou Mineral Water

1) "Party A" hereby appoints "Party B" as the exclusive distributor for Manitou Springs Mineral Water.

2) "Party B" shall pay to "Party A", in advance, One Million Dollars (USD $1,000,000) in order to obtain distributorship, and shall pay additional One Million Dollars (USD $1,000,000), in advance, in order to purchase Mineral Water.

3) "Party B" shall pay to "Party A" One Hundred Thousand Dollars (USD $100 000) as earnest contract money, and shall pay the remainder of One Million Eight Hundred Thousand Dollars (USD $1,800,000) by December 23, 2004.

4) The contract term for "Party B" is 5 years; "Party B" must order more than $1,000,000 per year from 2 years after starting the business; and all payments to purchase Manitou Mineral Water must be made in advance.

5) "Party B" shall place orders in writing approximately 3 months before delivery, and our price is US $1 per 1L bottle.

6) "Party B" shall establish and operate a U.S. company in NY for smooth supply of the products and sales efforts.

7) This contract shall be effective on the date "Party B" pays the remaining balance due in full; and "Party A" shall provide all materials about Manitou Mineral Water and shall cooperate upon call for assistance from "Party B".

8) Any undocumented business matters shall be executed according to general commercial terms and conditions; both parties shall affix signatures below, make 2 copies of this contract, and each party shall keep one copy in its possession.

Manitou Mineral Water Inc.                      Journalists Federation of Korea
President, O Yoon Kwon                           Director, Young Gil Jee
Signed: O Yoon Kwon                              Signed: Young Gil Jee

# 계 약 서

매니토우 미네랄 워터 대표 권오윤(갑)과 한국언론인 연합회 본부장 지영길(을) 간에 매니토우 스프링스 미네랄 워터의 원활한 판매를 위하여 다음 사항을 합의 계약함.

Menitou Mineral water

1) 갑은 을에게 매니토우 스프링스 미네랄 워터의 지정 판매권을 부여한다.

2) 판매권 이양 조건으로 을은 갑에게 금 100만불( US $ 1,000,000 )을 지급하고, 미네랄 워터 대금 일백만 불 ( US $ 1,000,000 )을 선 지불키로 한다.

3) 을은 갑에게 계약금으로 일십만 불( US $ 100,000 )을 지급하고, 잔금 180만불( US $ 1,800,000 )은 2004년 12월23일 까지 지불키로 한다.

4) 을의 계약기간은 5년으로 하고 사업개시 2년 뒤로부터 매년 일백만 불 이상을 주문 발주 하여야 하고 매니토우 미네랄 워터의 물품대는 선금을 원칙으로 한다.

5) 을은 물량 주문 시 통상 3개월 전에 문서로 주문 발주하여야 하며 출고 가격은 1L 한 병 당 US $ 1 로 정한다.

6) 을은 미네랄 워터의 원활한 판매와 매출 증대를 위하여 뉴욕에 법인 사무실을 두고 운영토록 한다.

7) 을은 잔금 지불 시 본 계약의 효력이 발생하며 갑은 원활한 판매와 매출을 위하여 을의 요청 시 미네랄 워터에 관한 모든 자료를 제공하고 적극 협력한다.

8) 명문화 되지 아니한 제반사항은 일반상거래에 따르며 후 일을 증 하여 본 계약서를 2부 작성하여 서명 날인하여 보관한다.


Manitou Mineral Water INC.
President
권오윤

Journalists Federation of Korea
Director
지영길

Exhibit 2



# Exhibit 3

매니토우 스프링스 미국 판매용    ( *U.S. 4* )



# Exhibit 4

Page 1 of 1

매니토우 스프링스 국내 판매용    (KOREA)



MINERAL WATER

Manitou Springs

SINCE 1884
FROM HISTORIC MANITOU SPRINGS
AT THE FOOT OF PIKES PEAK MOUNTAIN

1 Liter (33.8 fl.oz)

**Nutrition Facts**

DISTRIBUTOR: HO-MYUNG TRADING CO.,LTD.

Exhibit 5

Dear President, Jung Hee Kim

How have you been? Sorry for not being able to give a decent salutation at the end of the year. Cur couple in here is doing well and we frequently talk about President, Kim. Thought about how much trouble it was required by watching the TV COMMERCIAL that was filmed and edited on summer of last year. It was like the support and the hard work of many people and its outcome that was displayed as it is. Wished to claim one or more of the original work to give each copy to the Mayor Marcy Morrison and Kitty Clemens. Then in circumstance when requesting this kind of assistance, it will be easier to pull out the tall.

As roughly known, a heavy snow has fallen three to four times in the past couple weeks due the weather phenomenon. Since the water production is operated indoor, there was not much of a change but because of the road not being good, employees had problems coming to work and therefore, could not say it was entirely problem free but still operated during that time.

The reason I am writing this unexpected letter to President, Kim is to sort several conversations that was exchanged with James Lee and Thomas, and also hoping to be any help in establishing two companies' cooperation relationship. Assume that several conferences about the business with President, Kwon has not been able to work out easily. It is not tolerable for oneself to discreditably speak about a person attend on, but his business management method often has been disappointing. Conducting the business is President, Kwon's duty, and therefore, is no business of mine. In the first place, three years ago, I came for a production charge and I believed to be only devoted to my role and there is no change in my role recognition.

Within given limited financial resources, equipments, and given funds, I was only to be devoted on the task of producing good products in effective way, and President, Kwon wished for the same. But as there are eyes and ears, a dissonance that is seeing and hearing is not steering by me. Could have believed as is usual with the business, but having composure of losing self-importance and instead care for others will make many things to work out more easily. Before mentioning about the law, is it foolishness to believe that things can work out according to common knowledge and pure logic. Until the understanding that every people related in the business is not an opponent, but friends who can give help in my gains, the creak sound will never disappear.

Now, I will speak about the problems that I feel and are closely approaching to a reality. The cause is in finding the first step of a solution for the problem. Causing a failure upon oneself pushed by the problems, or substantializing the problem and finding the first step to a solution is after all, the duty of the CEOs who have the

decisive power over the business. But as for me right now, I am lifting up the wounds for the sake of two companies with my deepest feeling.

President, Hong Il Park is telephoning on occasion. It can be from an anxious and worried feeling, and foremost because of sale progress and secure of the quantity. Would have done the same if oneself was in that place. It is a logical reason. Since I am not able to make contact frequently, do understand about frequent phone inquiries. Due to a cold recently, it was sorry being not able to answer sufficiently. Grasping the business over the phone or delivering the status is simple and can be effective, but its difficultness in delivering ample explanations and detailed situations can posses a standpoint on causing misunderstanding between both parties. In some way, these works that we all are doing can be a sort of a trade that comes and goes within two different business cultures. Understanding with fathom and respect between both parties must proceed and also in need of some degree of patience.

Keeps asking about the yield of goods per day but it is a perplexed question for me as well. With present equipments and staffs and when everything runs smoothly, able to produce four thousand or five thousand bottles per day. But days when bottles and other materials come in or when finished goods go out, it can cause to spend half the day on the task, and during these days, the yield of goods per day will decrease. Also considering experience on the past few weeks, in foul days when there are heavy snow due to a bad weather, employees are unable to show up to work and snow removing work or other things that interrupt the production may occur. Therefore, taking some period of time and telling statistical data seem to be the precise answer.

And December is the time period where the yield of goods bound to decrease. Hence, targeting the yield of goods in standard to December is not appropriate. Employees must visit their parents and siblings who they have not been able to visit year all along, and also it is the season where parties are gathered and therefore is not easy thing to persuade these people to work.

As President, Kim also assumes, this factory does not carry middle manager and hence things is not workable if I do not settle things all by myself. Personnel management, financial management, production management, equipment inspection, and even documents organizing must be done by self and this particular formation causes many tough situations. Because someone has to be able to speak two languages in order to give me help in here or to the company, it is not easy. But as the structure of the company grows bigger and increase on the revenue, this problem may be solved.

The biggest problem is that the necessity materials are not purchasable in a proper time. For example, there was a time a delivery of the box has been delayed one week. It was for two reasons. First reason was the late payment on the bill which has caused the delay on the production and on top of that, the

delivery has been put off due to the heavy snow, and after all caused to be delayed one week. Even if one thing makes a trouble among the ten things that are essential in making the bottle of water, production ca n't be done and have to spend the time doing nothing. As long as water bottle, cork, label, box, pallet, shrink wrap, tapes, and laborers are completely equipped and there is no weather phenomenon, with present equipments and staffs, can easily produce 100,000 bottles in one month. But even if one thing makes trouble, can't do anything at all. At least two months of materials have to be prepared beforehand in orde to produce the goods as it is scheduled without any setback. Then are these production formation secured, n y answer in NO. I am feeling anxious for this reason. In my point of view, there is no emergency counterpl n.

After all, material expenses and general operating expenses come in as the problem. Have calculated material expenses and general operating expense for manufacturing 100,000 bottles. General expenses of $20,000, material expenses of $30,000 has been calculated. This is the amount based on the prior outgo expenses in minimum. Enclosed expenses statement is for President, Kim's understanding and I am enclosing it with willingness to submit myself in jeopardy. By any possibility if President, Kwon finds out, I can be in an awkward situation, so please keep a secret from outsiders and hoping that this will not l e coming back in any form of a weapon. Not sure about how President, Kwon thinks, but in my naïve point of view, I'm confidence that our goods sales from Ho Myung and Hwa Jin is a big opportunity for the company's growth, and have concluded that doing one's best to make things to progress well is fist and le st step to take for all of us. Thus this feeling of ambition but its estrangement from the reality has created mi id being out of fix.

Although detailed portions are not mutually agreed, if smooth sales and amicable secure of the quantity and at least financing to support all those things can be accomplished in a proper time, everythin; will be work out without any difficulties. Request of you to discuss this with capable staffs in the surrounding and do inform about any good plan if there is and I will now shorten the letter at this extent. Wish that upcoming year will be a blessing year for President, Kim and your family and every member of your company.

January 10, 2007

Yours truly, Jhon, Nahm In

## Monthly Factory Expenses Statement

### (Standard 100,000 bottles production per month)     01.7.200
standard

| | | |
|---|---|---|
| Electric charge and City gas | 700 (dollar) | There is difference between summer and winter but predicts that the cold weather during winter will raise the gas charge and summer's long work hours will raise the electric charge. |
| Telephone charge | 150 | Currently, two telephone lines are installed.  General line and fax line is each installed but demand of an upgrade. |
| Water charge | 120 | Used on four bathrooms as well as the cleaning room and interior and exterior of the factory's maintenance of cleanliness. |
| Vermin and insect exclusion | 60 | Monthly insecticide process in destroying general vermin and insects, caused by woods and tress near factory surrounding, to protect the goods. |
| General insurance | 800 | To protect factory building and equipments from natural disaster. |
| Employee accident insurance | 300 | Employee accident insurance arranged by the state law. There is no particular dangerous element in factory work but it is to make ready for chance of a possibility. |
| Accounting expense | 150 | Arrange and report on employee wages, tax computation and other expenses. Accumulated documents are used for end of year tax settlement. |
| Copy expense | 50 | Copy and arrange of various documents and related materials. |
| Office supplies expense | 100 | Printer, fax machine and other necessity supplies. |
| Bank account maintenance fee | 30 | |
| Delivery service and postal fee | 150 | UPS, FEDEX, domestic and international postal expense. |
| Car maintenance and gas fee | 300 | |
| General supplies | 150 | Toilet paper, paper towel, cleaning equipments and supplies. |
| Transportation tool and rent fee | 1,500 | Forklift rent fee, rental fee per onetime $250. Mailing of 100,000 bottles is roughly 6 container quantity. |

## 100,000 bottles material cost (1litter)

| | | |
|---|---|---|
| Water bottles(includes ship fee) | $18,000(includes ship fee) | 100,000 |
| Label | $5,500 | 100,000 |
| Box | $3,600 | 8,400 |
| Bottle cork | $1,700 | 120,000 |
| Box, tape and plastic safeguard for goods | $500 | 100,000 standard |
| Palette(wood prop) | $800 | $8.00 x 100 |
| Other material cost | $500 | |
| Total | $30,600 | |

Factory operating expenses total ------------ $19,830.00

Material cost total   --------------------------- $30,600.00

Grand Total ------------ $50,430.00

김 정 회 사장님 귀하

그 동안 안녕하셨습니까? 년 말 년 시에 변변한 인사 한번 드리지 못하여 죄송스럽게 생각하고 있었습니다. 여기 저희 내외는 별탈 없이 잘 지내고 있고 김 사장님 이야기를 자주 하고 있지요. 지난해 여름 촬영하여 편집한 TV COMMERCIAL 을 보고서 무척 수고 했다는 생각이 들었습니다. 여러 사람들이 서로 협조하고 공들인 결과임이 그대로 드러났다 고나 할까요. 원본을 한 두개 더 구할 수 있으면 여기 시장님 Marcy Morrison 씨와, Kitty Clemens 에게도 하나씩 드렸으면 좋겠다 싶었지요. 그러면 앞으로 이런 도움을 요청할 때 쉽게 말을 꺼낼 수 있지 않을까 생각이 됩니다.

얼추 아시겠지만 지난 몇 주일은 기상 이변으로 하여 서너 번의 폭설이 왔지요. 물 만드는 작업이야 실내에서 하는 일이라서 큰 변화는 없지만 길이 좋지 않아 종업원들이 출근에 문제가 있으니 전혀 문제가 되지 않는다고는 할 수 없지만 그 와중에서도 작업을 했지요.

제가 새삼스럽게 김 사장님 께 이런 편지를 드리는 것은 지난 몇 달 동안 James Lee 나 Thomas 등과 몇 차례 나눈 대화도 정리 할 겸, 그리고 앞으로 두 회사간의 협조관계를 확립하는데 있어서 어떠한 도움이 되지 않을까 해서 입니다. 권 사장님과의 사업상 여러 가지 협의는 쉽게 풀어지지 않았으리라 짐작합니다. 모시고 있는 분을 욕되게 하는 언행은 스스로 도 용납 할 수 없는 일이나, 그 분의 사업경영 방식에 대하여서는 때로 실망을 금치 못 할 때 가 많았습니다. 사업을 끝고 나가는 일은 권 사장님 몫이니까 제가 관여 할 바는 아닙니다. 3 년 전 애당초 제가 여기 온 것도 생산 담당이었으니까 저는 제 역할에만 충실하면 되는 걸로 알고 있었고 현재 까지도 이러한 저의 역할 인식에 있어서는 큰 변함이 없습니다.

주어진 제한된 재원, 시설로 써, 그리고 주어진 자금 한도 내에서 가장 효율적으로 좋은 제품을 생산하는 임무에만 충실하면 되는 것으로 알고 지내 왔고 권 사장님도 그러기를 바라셨습니다. 그러나 눈이 있고 귀가 있으니, 보이고 들리는 불협화음들이 나를 비껴 가지는 않고 있지요. 사업이란 으레 그런 것이려니 할 수도 있겠으나, 따지고 보면 조금만 더 독선을 버리고 남을 배려하는 어느 정도의 여유로움이 있을 때, 많은 일들이 쉽게 풀어 질 수 있으리라 여겨 졌습니다. 법을 둘덕 거리기 전에 상식과 순리대로 일을 풀어 갈 수 있으리라고 믿는 것이 치기이기만 일까요. 사업 상 얽히는 모든 사람들이 적이 아니라 모두가 나의 이익에 도움을 주는 좋은 친구들이라는 인식이 들지 않는 한 삐걱 거리는 소리는 결코 사라지지 않으리라 생각 됩니다.

이제 제가 느끼고 있고 현실로 성큼 다가오는 문제들을 말씀 드리겠습니다. 이유는 문제 해결의 실마리를 찾는데 있습니다. 문제에 떠 밀려 실패를 자초하느냐 아니면 문제를 실체화하여 실마리를 찾아 해결로 인도 하느냐 하는 것은 결국,

사업 결정권자인 CEO 둘의 몫 입니다. 그러나 저는 지금, 두 회사를 위하는 충정어린 마음으로  상처와 치부를 들쳐 내는 일입니다.

박홍일 이사가 수시로 전화를 해 옵니다. 이것 저것 궁금하고 답답한 심경에서 일수도 있겠고, 무엇 보다도 판매 진행에 따른 물량 확보 때문일 것입니다. 본인이 그 자리에 있었어도 그리할 것입니다. 그게 순리이니까요. 여기서 제가 자주 연락을 드리지 못하니 전화 문의를 자주 하지 않나 하고 이해합니다. 최근에 목 감기가 들어 변변히 대답을 못해서 미안한 일이기도 했습니다. 또한, 전화로 업무를 파악하거나 현황을 전달하는 것은 간편하여 효율적일 수는 있으되, 충분한 설명과 세세한 사정이 전달되기 힘들어 피차간 오해를 불러올 소지 또한 클 수 있겠다는 입장입니다. 어떻게 보면, 저희 모두가 하고 있는 이 일 들은 다른 두 사업 문화 속에서 오고 가는 일종의 교역이라고 도 할 수 있지 않겠습니까. 피차간의 심도 있는 이해와 존중이 선행 되어야 할 것이고 어느 정도 의 인내 또한 필요하리라 생각됩니다.

일일 생산량을 자꾸 묻는데 저로서도 난감한 질문입니다. 현재 시설과 인원으로 모든 것이 순조롭게 진행될 때 일일 4 천 또는 5 천 병은 만들 수 있습니다. 그러나 물병이나 기타 재료가 들어 오거나 또는 완성된 제품이 나가는 날은 거기 달라 붙어 일을 하다 보면 반나절은 쉽게 지나니 이런 날은 일일 생산량이 줄어 들겠지요. 그리고 지난 몇 주간 경험한 바로 기상이 나빠 폭설이 내리는 악천후 속에서는 종업원들이 아예 출근을 하지 않는 경우도 있고 제설 작업이 딸지 또 생산을 방해하는 일들이 생길 수가 있습니다. 결국은 어느 정도의 기간을 잡고 통계적으로 말씀을 드려야 정확 한 답이 될 것으로 사료 되는 사항입니다. 그리고, 12 월은 시기 적으로 생산량이 떨어 질 수 밖에 없는 기간 입니다. 따라서 12 월을 기준으로 생산량을 가늠하는 것은 타당하지 않다고 봐야 할 것입니다. 종업원들도 일년 내내 찾아 뵙지 못했던 부모 형제들을 봐야 하고 또한 일년 중 가장 Party 가 많이 몰려 있는 계절이니까 이 사람들을  설득하여 일을 시키는 일 또한 결코 쉬운 일이 아니 지요.

김 사장님께서도 짐작 하시 겠지만 이 공장은 중간에 middle manager 가 있는 것이 아니라서  모든 일을 제 혼자 처리 하지 않으면 일이 되질 않고 있지요. 인사 관리, 재무관리, 생산관리, 설비 점검에서 서류 정리에 이르기 까지 혼자 할 수밖에 없는 구조적 특수성 때문에 어려울 때가 많습니다. 왜냐하면 누군가 이곳에서 나에게 또는 회사에  도움을 주기 위해선 이 중 언어를 구사해야만 하니까 이게 쉽질 않지요. 회사 규모가 커지고 Revenue 가 많아 지면 해결 될 수 있는 문제 겠지만요.

무엇 보다도 큰 문제는 필요한 원자재가 적시에 구입이 안 되는 일 입니다. 한 예로서,  box 배달이 일 주일 늦은 적이 있습니다. 두 가지 이유 였지요. 첫 번째 이유는 대금 지불이 늦어 생산이 지체된 다가 설상 가상으로 폭설 때문에 운송이 늦어져서, 결국 예정 보다 일 주일 늦게 되었지요. 병물 만드는데 없어서는 안될 10 여 가지 중에 한 가지 씩 이런 식으로 말썽을 피우면 결국 생산을 하지 못하고 멍

③ ½<br>7

하니 시간만 보낼 수 밖에 없는 일입니다. 물병, 마개, 레벨, 박스 , pallet, shrink wrap, tapes, 그리고 일꾼 들이 완벽하게 구비 되고 큰 기상의 이변이 없는 한, 현재 시설과 인원으로도 한달 10 만병은 무난히 만들 수 있다고 봅니다. 그러나 이중 하나라도 삐꺽 하면 아무 것도 할 수 없지요. 최소한 두 달 정도의 원자재는 미리 준비해 놓아야 제 스케줄 대로 차질 없이 제품을 생산 할 수 있으리라 생각 됩니다. 그러면 현재 이러한 생산체제가 확보되어 있는 걸까요. 제 대답은 NO 입니다. 제가 답답함을 느끼고 있는 이유도 바로 여기에 있습니다. 제 가 보는 견지에서 아무런 비상 대책이 서 있질 않습니다.

결국 원자재 비용과 기본 운영비가 문제로 대두 됩니다. 10 만병 생산 시 필요한 원자재 비용과 기본 운영비를 산출하여 보았습니다. 기본 운영비 2 만불, 원자재 비용이 3 만불 정도 산출됩니다. 모든 걸 최소로 했을 때 그 동안 지출된 비용에 근거하여 나온 액수 입니다. 동봉하는 비용 명세서는 김 사장님의 이해를 돕기 위하여 제가 위험을 감수 하고 보내 드리는 것 입니다. 혹시라도 권 사장님 께서 아시면 제 입장이 난처하게 될 수 있으니, 대외비로 해 주시기 바랬고 차후 라도 이것이 어떠한 형태로든 위험한 무기가 되어 돌아오지 않기를 희망하는 바입니다. 권 사장님께서는 어떻게 생각하시고 계실지 모르시겠지만, 제가 보는 소박한 견지로는 호명과 화진에서의 저의 제품 판매가 회사 성장에 있어서 커다란 기회라고 확신하고 있으며, 어떻게 하든 이 일이 잘 진행 될 수 있도록 최선을 다하는 것 만이 우리 모두가 나가야 할 유일한 길이라고 결론 내렸지요. 그래서 느끼는 이상과 현실과의 괴리감으로 마음이 편치 않았습니다.

세세한 부분들이 합의되지 않았더라도 순조로운 판매와 원활한 물량확보 그리고 그 모든 것을 뒷받침 해줄 수 있는 최소한의 자금 조달이 적기에 이루어 진다면 모든 일 들이 어렵지 않게 풀려 나갈 것이라고 확신합니다. 주위의 유능한 참모들과 협의하여 좋은 방책이 있으시면 알려 주시기를 바라면서 이만 줄입니다. 새해에는 김 사장님 개인 뿐 만 아니라 가족 그리고 회사의 모든 구성원들이 복 받는 해가 되시길 기원 합니다.

2007 년 1 월 10 일

전남인 배상

# 월 공장 운영비 명세서

**(매월 10 만병 생산 기준)**          **2007 년 1 월 7 일 기준**

| | | |
|---|---|---|
| 전기료 및 도시개스 | 700 (dollar) | 여름과 겨울에 차이가 있으나 겨울은 추워 개스비가 상승하고 여름은 작업시간이 길어져 전기료 인상이 예상됨. |
| 전화료 | 150 | 현재는 두개의 전화선이 설치되어 있음. 일반 라인과 팩스라인이 하나씩 설치되어 있으나 upgrade 가 요망됨. |
| 수도료 | 120 | 네개의 화장실 및 청정실과 공장 내외의 청결유지에 사용됨. |
| 해충 및 벌레제거 | 60 | 공장 주위의 숲과 나무로부터 생기는 일반해충 및 벌레로부터 제품을 보호하기 위하여 매달 실시하는 살충작업. |
| 일반 보험 | 800 | 천재 및 인재로 인한 공장의 건물과 시설을 보호하기 위함. |
| 종업원 상해보험 | 300 | 주법으로 정한 종업원 상해보험. 작업 공정에 특별한 위험요소는 없으나 만일의 경우를 대비하기 위함. |
| 회계비용 | 150 | 종업원 급료 세금계산 및 비용을 정리보고 하며 축적된 자료는 년 말 세금정산에 사용됨. |
| 복사 비 | 50 | 각종서류 및 관련자료의 복사 정리 |
| 사무실 소모품비 | 100 | 프린터, 팩스 머신등에 필요한 소모용품 |
| 은행구좌 유지비 | 30 | |
| 택배 및 우편비용 | 150 | UPS,FEDEX, 국내외 우편물 우송비용 |
| 차량유지 및 개스비 | 300 | |
| | | |

5/7

| 일반 소모품 | 150 | 화장지, 종이 타월, 청소도구 및 소모품 등 |
|---|---|---|
| 운반기구 렌트비 | 1,500 | Forklift 렌트비. 1 회 사용료 $250. 10 만병 우송시 대략 6 container 분량임. Forklift 구입시(2 만불정도) 삭제될 수 있는 항목임. |
| 쓰레기 수거료 | 50 | 매주 금요일 수거. |
| 인터넷 사용료 | 60 | Comcast |
| 종업원 인건비 | 8,560 | 4 명의 전일 근무자와 2 명의 부분 근무자로 구성. 전일 근무자는 시간당 10 불, 부분 근무자는 9 불을 지급함. 주당 40 시간을 기준함.<br>전일 근무자: $10 X 160 시간/매월=$1,600<br>부분근무자: $9 X 120 시간/매월 =$1,080<br><br>4 full time = $6,400;  2 part time=$2,160 |
| 종업원 점심 | 800 | |
| Plant manager 봉급 | 5,000 | |
| 총 합 계 | $19,830 | |

6/7

# 10 만 병 당재료비(1 리터)

| | | | |
|---|---|---|---|
| 물병(운반비 포함) | $18,000 ( 운송료 포함 | 10 만개 | |
| 라벨 | $5,500 | 10 만개 | |
| 박스 | $3,600 | 8,400 개 | |
| 병 마개 | $1,700 | 12 만개 | |
| 박스 테잎 및 생산품 보호용 플라스틱 | 500 | 10 만병 기준 | |
| 팔렡(나무 받침대) | 800 | $8.00x100 | |
| 기타 재료비 | $500 | | |
| 총합계 | $30,600 | | |

공장 운영비 총합계 ------------    $19,830.00
재료비 총합계        ------------    $30,600.00

Grand Total  ---------    $50,430.00



# Exhibit 6

2007-7-6
별첨 4

# 왜! 마니토우 스프링스가 가장 좋은가?

## 비만, 변비와 아토피, 마시는 물로 해결한다!



PURE NATURAL
MINERAL WATER
Manitou Springs



"물이 모든질병을 치유한다" (영국의사 뱃 댄 갤러지 박사)

Manitou Springs
SINCE 1884.
Total Dissolved Solids (TDS) 1,600mg/l
FROM ELECTRIC MANITOU SPRINGS
at foot of PIKES PEAK MOUNTAIN

✓ 천연광천수로서, 인체에 유익한 미네랄이 250mg/리터 이상 함유하여야 하며, 1,500mg이상 함유하면 High Mineral이라고 한다.

✓ 순수 자연광천수로서 화학처리 할 수 없다. FDA 검사에 합격하면 병에 미네랄워터를 표기할 수 있다.

✓ 최상급 미네랄워터로서 자연광천수입니다. 타제품과 비교하여 보십시오.

## 물만 잘 마셔도 무병장수할 수 있습니다.

알고 계십니까? 현대질병의 원인은 자연 미네랄 부족에서 온다는 사실을 말입니다. 자연에서 생산되는 가장 중요한 미네랄 30여가지가 부족하면 변비, 아토피, 당뇨병, 위장병, 고혈압 및 비만과 같은 현대 성인들에게 가장 많이 찾아오는 만성질병에 걸리기 쉽습니다. 까다롭기로 유명한 FDA의 미네랄 워터 기준을 통과한 마니토우 스프링스 자연상태에서 물 1쿼터당 1,600mg의 미네랄이 함유되어 있는 마니토우 스프링스는 120년의 역사를 지닌 신비스러운 약수로 이미 잘 알려져 있는 미네랄 워터입니다.

마니토우 미네랄 워터는 120년 역사를 지닌 신비스러운 약수로 알려지고 그 효력은 역시 대통령 루즈벨트, 그랜트 대통령을 비롯하여 세계 유명인사들 병을 고친 기록이 입증하고 있습니다. 이 물은 120년전부터 의사의 처방에 의하여 천식, 충치, 당뇨, 신장, 고혈압, 류마티즘 관절염, 위 질병에 사용한 기록이 박물관에 보존되고 있습니다.

**■ FDA승인을 받은 100% 천연 미네랄 워터는 많이 드셔도 전혀 부작용이 없습니다.**

1. 변비가 있으신 분
2. 소화장애가 있으신 분
3. 기침, 천식이 있으신 분
4. 피부가 건조하신 분
5. 알러지가 있으신 분
6. 비만이 있으신 분
7. 음주 후 숙취가 있으신 분

**■ 중장기적으로 계속 드실 때 효과가 있는 분**

1. 당뇨가 있으신 분
2. 고혈압이 있으신 분
3. 충치가 있으신 분
4. 신장질환이 있으신 분
5. 류마티즘이 있으신 분
6. 관절염이 있으신 분
7. 알콜중독이 있으신 분

한미 홈쇼핑
## 646-671-1414 / 718-359-4448
### 33-70 Prince St., #704 Flushing, NY 11354

# 왜!

# 마니토우 스프링스가 가장 좋은가?

## 비만, 변비와 아토피, 마시는 물로 해결한다!







### 물만 잘 마셔도 무병장수할 수 있습니다.

알고 계십니까? 현대질병의 원인은 자연 미네랄 부족에서 온다는 사실을 말입니다. 자연에서 생산되는 가장 중요한 미네랄 30여가지가 부족하면 변비, 아토피, 당뇨병, 위장병, 고혈압 및 비만과 같은 현대 성인들에게 가장 많이 찾아오는 만성질병에 걸리기 쉽습니다. 까다롭기로 유명한 FDA의 미네랄 워터 기준을 통과한 마니토우 스프링스 자연상태에서 물 1리터당 1,600mg의 미네랄이 함유되어 있는 마니토우 스프링스는 120년의 역사를 지닌 신비스러운 약수로 이미 잘 알려져 있는 미네랄 워터입니다.

마니토우 미네랄 워터는 120년 역사를 지닌 신비스러운 약수로 알려져 있고 그 효력은 역대 대통령 루즈벨트, 그랜트 대통령을 비롯하여 세계 유명인사들 병을 고친 기록이 입증하고 있습니다. 이 물은 120년전부터 의사의 처방에 의하여 천식, 충치, 당뇨, 신장, 고혈압, 류마티즘 관절염, 위장병에 사용한 기록이 박물관에 보존되고 있습니다.

■ FDA승인을 받은 100% 천연 미네랄 워터는 많이 드셔도 전혀 부작용이 없습니다.

1. 변비가 있으신 분
2. 소화장애가 있으신 분
3. 기침, 천식이 있으신 분
4. 피부가 건조하신 분
5. 알러지가 있으신 분
6. 비만이 있으신 분
7. 음주 후 숙취가 있으신 분

■ 중장기적으로 계속 드실 때 효과가 있는 분

1. 당뇨가 있으신 분
2. 고혈압이 있으신 분
3. 충치가 있으신 분
4. 신장질환이 있으신 분
5. 류마티즘이 있으신 분
6. 관절염이 있으신 분
7. 알콜중독이 있으신 분

## 홈쇼핑 646-671-1414 / 718-359-4448
### 33-70 Prince St., #704 Flushing, NY 11354