UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HO MYUNG MOOLSAN CO., LTD., and HYUN-SONG KANG, :<br>:<br>Plaintiffs, :<br>:<br>v. :<br>:<br>MANITOU MINERAL WATER, INC., :<br>RAPHAEL DRUG AND HEALTH CO. :<br>O-YOON KWON; NAM-IN JHON, :<br>HANMI HOME SHOPPING COMPANY, ;<br>NEW YORK FLEA MARKET NEWS :<br>a/k/a WWW.FINDALLUSA.COM :<br>JOHN DOES 1 THROUGH 10, :<br>JANE DOES 1 THROUGH 10, and :<br>ABC COMPANIES 1 THROUGH 100, :<br>:<br>Defendants. : | 07 CV 7483 (RJH) |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF PRELIMINARY INJUNCTION**

                                                    Michael S. Kimm, Esq.
                                                    190 Moore Street, Suite 272
                                                    Hackensack, NJ 07601
                                                    201-342-3377

                                                    Jay H. Kim, Esq.
                                                    477 Madison Avenue, 9 th Floor
                                                    New York, NY 10022
                                                    Attorney for plaintiff

Dated: October 10, 2007

## PRELIMINARY STATEMENT

Plaintiffs Hyun Song Kang and Ho Myung Moolsan Company respectfully submit this reply memorandum of law in further support of their application for preliminary injunction preventing defendants from interfering with plaintiff's <u>exclusive rights</u> to sell "Manitou Springs Mineral Water" brand in Korea and the United States and throughout the rest of the world, based on the substantial evidence before the Court.

## THE MATERIAL FACTS

A. Defendants have stated that they received the "Contract" price of $1.5 million, which included $1 million advance payment for 1 million bottles of water. There is no dispute that $1 million advance payment was received by defendants for 1 million bottles of water and only 307,000 bottles have been delivered to plaintiffs, and delivery ceased April 2, 2007.

B. Plaintiff has spent approximately $3 million to develop the business and establish plaintiffs' business goodwill in the market place.

C. Plaintiffs were provided with the U.S. and Korea rights at the outset, and defendants were to have extended the rights to "global" rights within 6 months of September 2005, which was March 2006.

D. Plaintiffs maintain that the rights were "exclusive" as is discussed in plaintiffs' submissions and as is reflected in the Young Gil Jee "Abandonment Memorandum"

1

("Surrender Agreement") allegedly provided to defendants. Defendants claim that the one-page Contract forms do not say "exclusive" but they do not deny that discussing that issue.

E. Defendants concede, as stated in the September 30, 2005, hand written notes of defendant Kwon that they cleared the pre-existing sales network in Mexico, Los Angeles and other places, so as to provide a clean market for plaintiffs. Defendants do not dispute that plaintiffs established a significant market and that plaintiffs have established significant business goodwill, which is facing destruction because of defendants' acts.

F. Defendants admit that they failed to supply water since April 2, 2007. Defendants state that they failed to fill at least eight containers requested in May 2007 and they failed to ship further containers which became due in June, July, August, September and October 2007. Defendants' failure to ship is ongoing. Plaintiffs never refused any shipment.

G. Defendants admit that they engaged in sales and advertising of water sales (using plaintiff's brand, bottle and plaintiffs' water supply) to third-parties and through third-parties during the time they failed to ship any water to plaintiffs.

H. Defendants concede that plaintiffs established a sales network in Korea using plaintiffs' related company, Hwa Jin Cosmetics' 70,000 salesperson network, and that Hwa Jin's own business reputation has been damaged because its sales force has been unable to deliver what it had promoted and marketed to its customer base.

I. Defendants response primarily asserts that the one-page "Contract," on its face, does not say, "exclusive." Other than this claim, they have no real material and relevant

response to plaintiff's application for preliminary injunction maintaining the status quo.

**The status quo that should be maintained is the status quo of plaintiffs being the exclusive seller of the "Manitou Springs Mineral Water" brand, with no sales activity by defendants and/or their cohorts at all.** If the Court allows defendants to engage in any simultaneous sales activity, the Court would effectively be denying plaintiff's application.

Defendants have proffered no evidence — not even their own affidavit — discussing any "harm" that might be caused upon them if they were enjoined from any competing sales activity directly or through their sham conduits, including Hanmi Home Shopping, whose president has filed a demonstrably false sworn affidavit along with the false affidavit of O Yoon Kwon claiming that Hanmi was provided with only five boxes for free distribution, which is starkly contradicted by plaintiffs' Bong Sil Lee Declaration.

# REPLY ARGUMENT

## I

## BECAUSE DEFENDANTS HAVE UTTERLY FAILED TO REBUT PLAINTIFFS' WELL-GROUNDED PRIMA FACIE CASE FOR PRELIMINARY INJUNCTION UPHOLDING PLAINTIFFS' EXCLUSIVE SALES RIGHTS, FULL RELIEF SHOULD BE GRANTED

### A. The Essential Facts are Uncontroverted and Injunction Should be Granted

Plaintiffs' moving Memorandum of Law discusses the controlling law in the Second Circuit concerning provisional relief. Even if all of defendants' submissions were taken at face value, the first prong, issue of "likelihood of success on the merits of its case" is a foregone conclusion because of defendants' admissions that they failed to ship to plaintiffs since April 2, 2007, and they have sold to third-parties.

The second prong, "sufficiently serious questions going on the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor" is also decidedly resolved in plaintiffs' favor because defendants' acts have placed plaintiffs' very commercial existence on the line, and plaintiffs' moving papers have well-established the dire need to maintain the status quo of plaintiffs' exclusive distribution without interference and interloping by defendants to their sham, "free sample" vendors and cash accounts. Under leading cases like, Reuters Ltd. v. United Press International, Inc., 903 F.2d 904, 907 (2d. Cir. 1990), plaintiffs' application should be granted.

Defendants have not taken issue with plaintiffs' extensive discussions of acquiring

4

"exclusive" rights, but defendants merely assert, baldly, that the one-page "Contract" dated September 1, 2005, "does not contain any exclusivity language," they essentially argue.

Yet, they also rely upon an "Abandon Memorandum" made by their co-conspirator, Young Gil Jee, who has been sued in New Jersey, who purported to act as plaintiffs' agent in the early stage of this business development, who embezzled at least $500,000 of verifiable amount from plaintiffs by using dual agreements. Defendants now claim that those dual agreements clearly containing defendant O Yoon Kwon's signatures as being "forgeries" and discovery will presumably lead to the truth or falsity of such a claim.

(In this connection, defendants' characterization of facts asserted in plaintiffs' NJ complaint are also wide of the "mark." Plaintiffs alleged in their New Jersey complaint that one of the two undated one-page "Contract" forms made by defendant O Yoon Kwon, which he now disavows, with Young Gil Jee, contains a forged signature of Jeong Hee Kim, president of Ho Myung Moolsan, in order for Young Gil Jee to embezzle money. This statement was mischaracterized by defendants as somehow stating that the document itself was a forgery; which it is not.)

Taking defendants' assertion that Young Gil Jee had actually made an "Abandonment Agreement" on November 25, 2005, we must examine the document very closely. There is a conflict in the English language translation between the version contained in defendants' papers and the English version contained in plaintiffs' reply papers. As is discussed in the Reply Declaration of Jeong Hee Kim, the word "chong pan" is actually contained in the

5

original Korean version signed by Young Gil Jee and O Yoon Kwon, and that word, composed of two grouping of Korean characters, is circled in the version attached to the Ko Declaration. The circled Korean word is then identified in the <u>Minjung's Essence Korean-English Dictionary</u> (3d ed) at page 1881, identified by a drawn-box, where the exact same word, "chong pan" is defined. The English definition is "an <u>exclusive sales</u>; sole agency (trade) [and combined with "to do" in Korean is to say] make an <u>exclusive</u> sale [or] enter into a special contract for <u>sole agency</u>." (Emphasis added.)

(The English-language translator used by defendants obviously omitted translating the operative document, and this omission will presumably be admitted by the translator once the translator is able to review the dictionary.)

But the "Abandonment Agreement" refers to an exclusive agreement made on April 19, 2005" — "effective 2005 April 19" — which is not a document that defendants have ever provided to plaintiffs, or have produced in their answering papers. Thus, clearly, defendants created at least another document — a Contract dated April 19, 2005, — which governed their relationship when plaintiffs invested some $3 million to organize and establish the Manitou water business.

The undisputable facts are plaintiffs invested money and created a large demand where no identifiable demand existed before. (Indeed, even though defendants claim that they had a pre-existing market in Mexico, LA and other places, they have offered no evidence as to any sales volume.)

Apparently, as of April 2007, defendants realized that by selling plaintiffs' pre-paid water to third-parties, they could raise cash whereas if they shipped to plaintiffs they would have to ship another 700,000 bottles before they saw another dollar. This kind of perverted "logic" defines "abject bad faith" in the marketplace where a pre-paid product is ordinarily expected to be delivered, as contracted.

### B. No Bond Has Been Requested and None Should be Required

Defendants' papers have not raised any issue as to an "injunction bond." Defendants have not argued for any specific amount; and their papers do not demonstrate the possibility that they would stand to lose a certain amount if plaintiffs were granted preliminary injunction.

Bond is not routinely required. The Second Circuit has long held that the language of Rule 65(c) does not require the posting of security. As stated in United States v. Bedford Associates, 618 F.2d 904, 916-17 n.23 (2d Cir.) cert. denied, 456 U.S. 914 (1980), "the district court ha[s] the power to deny bond." As the Second Circuit also stated in International Controls Corp. Vesco, 490 F.2d 1334, 1356 (2d Cir. 1974), "the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined." See also Holborn Oil Trading Ltd. v. Interpetrol Bermuda Ltd., 658 F. Supp. 1205, 1211-12 (S.D.N.Y. 1987) that "the amount of the security given by an applicant for an injunction is a matter for the discretion of the district court, which may in the exercise of that discretion require the posting of no security at all." Because defendants have defrauded

plaintiffs and the injunction is required to restore some of plaintiffs' damage caused by defendants' bad faith business practices, and because defendants have failed to show any need for bond, <u>no bond should be required.</u>

### C. Summary of Relief Sought

The Court should grant plaintiffs' application for preliminary injunction in plaintiff's favor as follows:

A. enjoining and restraining the core defendants (Kwon, Manitou Mineral Water, Inc.) from interfering with the conduct of plaintiffs' exclusive distribution of Manitou Springs Mineral Water in the United States and Korea; and at any other location established by plaintiffs as of March 1, 2006 (i.e., "six months" after September 1, 2005) for the full duration of the five-year term as of September 1, 2005;

B. granting a mandatory injunction ordering the core defendants (Kwon, Manitou Mineral Water, Inc.) to complete the five-year term claimed to be in force by defendants themselves, as of September 1, 2005;

C. enjoining and restraining the secondary defendants (Hanmi Home Shopping and other such defendants) and all other persons and companies within the reach of Rule 65 from purporting to sell plaintiffs' "Manitou Springs" mineral water; or any mineral water from Kwon, Manitou Mineral Water, Inc.;

D. enjoining and restraining all defendants from destroying any evidence; from erasing any computer data; and from discarding any materials in connection with the conduct

of their affairs relating to the Manitou Springs mineral water business; and

    E. Other relief the Court deems just and proper under these circumstances.

## II

**DEFENDANTS' SO-CALLED CROSS-MOTION SHOULD BE DENIED AS PLAINTIFFS' CLAIMS ARE VIABLE AND PLAINTIFFS ARE ENTITLED TO DEVELOP THEIR CLAIMS IN DISCOVERY**

Defendants have filed an answer.

Normally, the filing of a Rule 12(b)(6) motion forestalls any "answer" on the theory that the party seeking relief under 12(b)(6) is "unable" to respond to the claims asserted in the complaint for legal deficiency.

Yet, simultaneously with their answer, defendants have moved to dismiss Hanmi Home Shopping on the assertion that Hanmi Home Shopping somehow did not engage in "commercial activity" because it merely provided "free samples" of only "five bottles" of water referred by defendants, and it pulled its advertisements concededly infringing upon plaintiffs' trademarks after only "two" runs of the advertisement, which itself was done as a gesture of friendship.

If those types of bald assertions of "charity for a friend" are accepted, there would be no viable "trademark infringement" case in this Court or any other court across the country. Defendant O Yoon Kwon's statements concerning Hanmi Home Shopping's role, and the corresponding statements of Hanmi Home Shopping's president, are both demonstrably

9

flagrantly false and flagrantly perjurious and the Court should referred those "affidavits" to the U.S. Attorney's Office for investigation for contempt of court, or the Court should hold its own contempt proceedings. In addition, because plaintiffs have been damaged by those sham submissions, by having to respond, the Court should grant attorneys' fees incurred by plaintiffs in this proceeding as a sanction for the sham affidavits.

Plaintiffs' complaint asserts, among other claims, trademark infringement, and defendants effectively concede this point. Since trademark infringement subjects even corporate officers to personal liability, see, e.g., Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1996), the liability of contributory infringers who are third-party companies engaged in profit-making activities, where "sales" has clearly been established (see Bong Sil Lee Decl.), there is no basis for "dismissal."

### III

### IF ANY ALLEGED GROUND FOR "DISMISSAL" EXISTS, PLAINTIFFS REQUEST LEAVE TO AMEND UNDER FED. CIV. R. 15, WHICH PERMITS LIBERAL AMENDMENTS IN THE INTEREST OF JUSTICE

Rule 15 permits liberal amendments in the interest of justice. If any of the alleged grounds for "dismissal" under Rule 12(b)(6) is deemed feasible, plaintiffs should be granted leave to amend. Plaintiffs intend to maintain the current posture of the case — seeking injunction against the "core" defendants and seeking damages against the "core" defendants and all other secondary defendants.

## IV

**ATTORNEYS' FEES SHOULD BE ASSESSED AGAINST DEFENDANTS FOR FILING SHAM AFFIDAVITS UNDER *PATSY'S BRAND, INC.***

In Patsy's Brand, Inc., v. I.O.B. Realty, Inc., 317 F.3d 209 (2d Cir. 2003), the Second Circuit affirmed Judge Martin's grant of significant attorney's fees in a trademark dispute where a false affidavit was submitted by defendants to oppose plaintiff's preliminary injunction application. See id. at 214. At the close of the case, plaintiff was granted sanctions for contempt of court, among other relief. Id. at 215.

The Second Circuit affirmed, holding that the Lanham Act permits a grant of attorney's fees in exceptional cases, which include instances of "fraud or bad faith." For these reasons, the Second Circuit upheld the contempt sanctions in the form of attorneys' fees, id. at 222, and the Court should grant the same relief here. A fee statement will be submitted upon the grant of this application for leave to file a fee application as remedy against defendants' sham affidavits. The Court should apportion the fees to the makers of the two sham affidavits — Myung Suk Lee and O Yoon Kwon — jointly and severally.

## **CONCLUSION**

For the foregoing reasons, the Court should grant plaintiffs' application in its entirety and deny defendants' cross-motion in its entirety.

Dated: October 10, 2007                    Respectfully,


                                           /s/ Michael S. Kimm

Certificate of Service

Michael S. Kimm, Esq., certifies the foregoing was served upon defendants' counsel by fax and mail.

>Andrew Kimler, Esq.
>Capell Vishnick, LLP
>3000 Marcus Avenue, Suite 1E9
>Lake Success, NY 11042
>Fax 516-437-4395

Dated: October 10, 2007                           /s/ Michael S. Kimm, Esq.