UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HO MYUNG MOOLSAN, CO. LTD.,

                    Plaintiff,

     -against-

MANITOU MINERAL WATER, INC.,

                  Defendant.

---

07 Civ. 07483 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Plaintiff, Ho Myung Moolsan ("Moolsan"), a South Korean mineral water reseller, brought this breach of contract action against defendant Manitou Mineral Water ("Manitou"), a mineral water manufacturer based out of Colorado and New York. At trial ending November 1, 2010, a unanimous jury returned a verdict for defendant on liability for all claims. This opinion sets forth the Court's reasoning for the following rulings made before and during trial:

      1.      Prior to trial, plaintiff alleged that the United Nations Convention on Contracts for the International Sale of Goods applied to this action. Because the parties consented by their litigation conduct to apply New York law, the Court applied New York law to the case.

      2.      Plaintiff alleged that the contract in question was an output contract. Defendant countered that the contract was an installment contract. Because the Court found that the contract authorized delivery by separate lots, the Court agreed with defendant that the contract was an installment contract.

3.      Prior to trial, defendant moved *in limine* to preclude plaintiff from introducing the testimony or report of their damages expert, Don Smith.  Smith's report calculated plaintiff's lost profits to be over $133 million.  Because the report was speculative and unreliable, usurped the role of the jury, or was not a proper subject for expert testimony, the Court excluded the report and precluded Smith from testifying.

4.      At trial, defendant objected to plaintiff's offer of PX 90A.14.  This exhibit consisted of documents purportedly summarizing plaintiff's sales activity in Korea.  Because the offered documents were admittedly created not during the period of sales but instead after litigation began and were inherently unreliable, and because underlying documents allegedly establishing sales were in existence but never produced during discovery, the Court excluded PX 90A.14.

5.      At the close of plaintiff's case, defendant moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law that plaintiff could not establish lost profits.  Because plaintiff presented no admissible expert testimony going to lost profits and because plaintiff's remaining documents going to lost profits (PX 90A.15) were speculative and unreliable sales projections, the Court ruled that plaintiff could not establish lost profits.

6.       Faced with the Court's ruling that it could not recover lost profits, plaintiff sought to recover those precluded damages as "lost sales."  Because the Court could find no authority distinguishing the two for the purpose of plaintiff's damages claim, the Court ruled that plaintiff could not recover "lost sales."

7.       Plaintiff sought to recover, as compensatory damages, $500,000 it allegedly paid and lost under the contract but that defendant claimed it never received.

Because that $500,000 loss was not proximately caused by defendant's breach of contract, the Court precluded plaintiff from seeking to recover that $500,000 from defendant.

        8.      During defendant's case, plaintiff moved to amend its complaint under Federal Rules of Civil Procedure 15(a) and 15(b) to add claims for fraud in the inducement of the contract and for negligent misrepresentation. Because these issues were not raised in the pleadings or pre-trial order, were not tried with the parties' consent, and had already been disposed of, and because any amendment would have been futile, the motion was denied.

## DISCUSSION

## I.     New York Law Applies To This Action

        Plaintiff filed its initial six count complaint on August 20, 2007. (Compl. at 14.) The relevant count for breach of contract was explicitly brought "[u]nder [s]tate [l]aw." (Compl. at 11.) In unsuccessfully seeking a preliminary injunction, plaintiff relied exclusively on New York law. (*See*, *e.g.*, Pl.'s Mem. dated Oct. 10, 2007.) And on appeal of this Court's denial of its motion for a preliminary injunction, plaintiff again relied upon New York law. *See Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 316 Fed. Appx. 40 (2d Cir. 2009). Thereafter, plaintiff was granted leave to amend its complaint and, once again, alleged breach of contract "[u]nder [s]tate [l]aw." (First Amend. Compl. at 15.) Nevertheless, following the close of discovery, plaintiff moved for summary judgment on its amended complaint, alleging for the first time that the United Nations Convention on Contracts for the International Sale of Goods ("CISG")

governed the dispute.  (Pl.'s Mot. for Summ. J. dated Dec. 30, 2009, attach. 2 at 6-7.)  On

June 29, 2010, the Court, applying New York law denied plaintiff's motion and granted

defendant's motion for summary judgment on all claims except for plaintiff's breach of

contract claim.  (Order of June 25, 2010 at 1-2.)

      In its proposed final pretrial order, plaintiff again asserted that the CISG applied.

Defendant objected, arguing that plaintiff had consented to the application of New York

law.  Defendant cited *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50 (2d

Cir. 1984) to support this contention.  That case found that though a lease stated it was to

be interpreted under Illinois law, the district court's application of New York law was not

error because "in the court below and in their original briefs in this Court, the parties

relied primarily upon New York authorities to support their respective contentions."

*Video Innovations*, 730 F.2d at 52.  In other words, "the parties to litigation [had]

consent[ed] by their conduct to the law to be applied [namely, New York law despite the

contract's Illinois choice of law clause]."  *Id.*; *see also In re Cross Media Marketing*

*Corp.*, 367 B.R. 435, 453 (Bankr. S.D.N.Y. 2007) (finding New York law consented to

on "all of the state law causes of action alleged [because] [n]one of the parties raised any

choice of law issues in the pleadings [and] . . . [f]or the most part, the parties briefed the

issues applying New York law.").

      The Court applied New York law to this dispute because, as demonstrated above,

plaintiff had relied exclusively on New York law, and not the CISG, until after the close

of discovery.  Most importantly, plaintiff alleged, and retained after amending its

pleading, a claim for "Breach of Supply Agreement *Under State Law*."  (Compl. at 11

(emphasis added); First Amend Compl. at 15 (emphasis added).)  While application of

the CISG may have been appropriate, plaintiff by its actions had consented to the application of the N.Y.U.C.C. and it was far too late to withdraw that consent without undue prejudice to defendant.  Moreover, as plaintiff expressly admitted that the CISG and the N.Y.U.C.C. were in all material respects the same, and that the only difference was in the notice requirement before bringing suit, (Tr. of Hr'g of Oct. 21, 2010 at 12), it seems that even had the Court applied the CISG, the course of the case would not have changed.

## II.     The Contract Was An Installment Contract

The parties signed a contract for the sale of mineral water on December 1, 2005. (Def.'s Trial Ex. 1)  Under the Contract, defendant agreed to sell a distribution right for its mineral water to plaintiff for $500,000 and agreed to sell mineral water to plaintiff at $1 per one-liter bottle. (*Id*. ¶¶ 3, 5.)  Plaintiff also made an advance payment of $1 million for mineral water inventory.  (*Id*. ¶ 3.)  The contract was to run for five years. (*Id*. ¶ 4.)  After the first year, plaintiff was required to make minimum yearly orders of $1 million worth of water.  (*Id*.)  Plaintiff was additionally required "to place its orders, in writing, normally 3 months in advance."  (*Id*. ¶ 5.)  And payment on orders was also to be made in advance.  (*Id*. ¶ 4)  Plaintiff argued that this writing constituted an "output contract" while defendant argued it was an "installment contract."

Generally, a contract is void under the Uniform Commercial Code if it does not specify a quantity term.  N.Y.U.C.C. § 2-201 cmt. 1.  A minimum quantity term, like the $1 million minimum for years two-through-five in the contract in question in this case, is satisfactory.  *Corning Inc. v. VWR Int'l, Inc.*, No. 05-CV-6532 CJS, 2007 WL 841780, at

*6 (W.D.N.Y. 2007) (citing *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 749 (2d Cir. 1998)).  When a contract contains a quantity term but allows for delivery in separate lots separately accepted, it is an "installment contract."  N.Y.U.C.C. § 2-612(1); *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978, 979-81 (S.D.N.Y. 1985).  A breach of the entire contract occurs only when a "non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract."  N.Y.U.C.C. § 2-612(3).  This standard for determining breach differs from that for single-lot contracts in that, for the latter, "if the goods or the tender of delivery fail in any way to conform to the contract," a breach has occurred and a buyer may reject the goods and cease performing under the contract.  N.Y.U.C.C. § 2-601; *Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Finance Corp.*, 567 F. Supp. 2d 579, 592 & n.93 (S.D.N.Y. 2008).  Additionally, a breach of an individual installment occurs when the default in question substantially reduces or impairs the value, to the buyer, of that shipment.  *Arkla Energy Resources v. Roye Realty & Developing Corp.*, 9 F.3d 855, 862-63 (10th Cir. 1993); 15 Williston on Contracts § 45:22.

As this district has recognized, the definition of an installment contract includes coverage of "installment deliveries tacitly authorized by the circumstances or by the option of either party."  N.Y.U.C.C. § 2-612 cmt. 1; *see Fashionwear (PVT) Ltd. v. Regatta (U.S.A.) LLC*, No. 03 Civ. 5597 (JFK), 2006 WL 695256, at *3 n.1 (S.D.N.Y. March 17, 2006).  Each delivery of a separate lot need not even be separately paid for. N.Y.U.C.C. § 2-612 N.Y. annot. 1.  Additionally, a contract that:

> provides that deliveries are to be made only at times authorized and
> chosen by the buyer, without specifying the times for delivery, may also
> properly be treated as an installment contract under the Code . . . since the

> uncertainty of when and if the buyer will request delivery does not change
> the essential character of the contract.

15 Williston on Contracts § 45:2 (4th ed. 2010).  Finally, the lack of a regular shipment

schedule does not preclude a contract's characterization as an installment contract.  *Id*.

Contracts that lack quantity terms but instead specify quantity based on the output

of a seller, on the other hand, are also valid.  N.Y.U.C.C. § 2-306(1)  An "output

contract" is one that measures "quantity by the output of the seller . . . as may occur in

good faith, except that no quantity unreasonably disproportionate to any . . . normal or

otherwise comparable prior output . . . may be tendered or demanded."  *Id*.; 3 Williston

on Contracts § 7:12 (4th ed. 2010) ("[A]greements by a seller to sell all the goods or

services he may produce to a buyer in exchange for the buyer's agreement to purchase

them are known as output contracts.  Because the quantity term of an output contract

varies, the test to determine breach centers on the parties' good faith in producing or

accepting amounts of the product in question.  *See* N.Y.U.C.C. § 2-306 cmt. 3.

The contract at issue in this case is clearly not an output contract.  Defendant's

output does not set the contract's quantity term and defendant was not entitled to force

plaintiff to accept shipments of water beyond the minimum one million bottles required

to be purchased each year after the first.  Moreover, the fact that defendant was likely to

allocate virtually all of its capacity to filling plaintiff's orders, at least until year two

when a second production line was installed, does not create an output contract in the

absence of an enforceable obligation by plaintiff to accept defendant's production.

The contract here is a hybrid installment-requirements contract.  In the first year

no minimum quantity of orders was required and the contract contained no quantity term.

Instead, as both parties stated in deposition testimony, the contract called for defendant to

fill whatever quantities plaintiff ordered.  (Kim Dep. at 163, 171-173; Kwon Dep. at 67.)
Thus in the first year the contract was a requirements contract.  However, the contract's
first year ended on December 1, 2006 and the alleged breach in this case occurred in the
spring of 2007.  After the first year, the contract required a minimum quantity of orders
of $1 million worth of water every year.  In other words, during the operative period, the
contract did contain a quantity term.  Because delivery would only follow separate
advance orders, placed by plaintiff at its discretion, after the first year the contract was an
installment contract.

## III.    The Smith Report Was Inadmissible

Plaintiff retained Don Smith, president of American Consulting Group, as an
expert to opine on several points of contract interpretation as well as on plaintiff's
measure of damages.  (Pl.'s Original Trial Ex. 90 ("Smith Report" or the "Report") at 2.)
Smith's Report concluded that plaintiff was not required to send formal purchase orders
to defendant; that the contract was an exclusive output contract; that defendant violated
plaintiff's exclusivity and trademark rights; that plaintiff did not require defendant to ship
it half-liter bottles of water (as opposed to liter bottles); and that plaintiff suffered over
$133 million lost profits due to defendant's breach.  (*Id*. at 3-9.)  Defendant contended
that the first and second conclusions reached questions of contract interpretation
improper for expert testimony; that the third conclusion was a legal opinion also
improper for expert testimony; that the fourth conclusion was a question of fact to be
decided by the jury; and that the fifth conclusion was based on unsupported speculative
assumptions.  (Def.'s Mot. In Limine To Exclude The Testimony of Don Smith dated

Sept. 20, 2010 ("Def.'s Smith Motion") at 4-6.)  Plaintiff responded that the credibility of

Smith's damages calculation was for the jury to decide and that his other conclusions

were simply the "facts" upon which Smith relied to reach his damages calculation.  (Pl.'s

Opp'n To Def.'s Motion To Exclude Testimony Of Don Smith dated Sept. 27, 2010

("Pl.'s Mot. In Limine Opp'n") at 3.)

> Rule 702 provides:
>
> [If] specialized knowledge will assist the trier of fact to understand the
> evidence or to determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

Fed. R. Evid. 702.  Moreover, "testimony in the form of an opinion or inference

otherwise admissible is not objectionable because it embraces an ultimate issue to be

decided by the trier of fact." Fed. R. Evid. 704(a).

District court judges must "ensure the reliability and relevancy of expert

testimony."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Relevance

turns on whether the testimony would assist the trier of fact in determining whether some

consequential fact is more or less probable.  Fed. R. Evid. 401; *Daubert v. Merrill Dow

Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (explaining that a study of the moon's

phases might help determine whether a certain night was dark but not whether someone

was unusually disposed to behave irrationally).

To ensure reliability the court must "make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the relevant

field." *Kumho Tire*, 526 U.S. at 152.  The court has broad discretion regarding both

*whether* testimony is reliable and *how* to test that testimony's reliability.  *Id.*  The district

court "must scrutinize not only the principles and methods used by the expert, but also

whether those principles and methods have been properly applied to the facts of the

case."  Fed. R. Evid. 702 Advisory Committee's Note.  At the same time, Rule 702 is not

meant to exclude all imperfect expert testimony; "[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*,

509 U.S. at 596.  However, "[t]he trial judge in all cases of proffered expert testimony

must find that it is properly grounded, well-reasoned, and not speculative before it can be

admitted."  Fed. R. Evid. 702 Advisory Committee's Note.  Finally, expert testimony

must not "simply address lay matters which the jury is capable of understanding" on its

own.  *In re Fosamax Products Liability Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)

("[T]he testimony is not helpful if it usurp[s] . . . the role of the jury in applying [the] law

to the facts before it.") (internal quotation marks and citation omitted); *see also United

States v. Mejia*, 545 F.3d 179, 194 (2d. Cir 2008) ("Testimony is properly characterized

as 'expert' only if it concerns matters that the average juror is not capable of

understanding on his or her own."); *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.

1994) ("A district court may commit manifest error by admitting expert testimony where

the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject

matter of the expert's testimony is not beyond the ken of the average juror.")

A.        **Smith's First Four Opinions Were Inadmissible**

Smith's first opinion was that the contract did not require plaintiff to place

separate and formal orders for mineral water shipments.  (Smith Report at 3.)  Smith's

evidence supporting that opinion was (1) that the contract provided for shipments of one

million bottles per year; (2) that defendant had already been paid for one million bottles;

(3) that defendant was behind in their "contractually-defined" shipments; (4) that

defendant was frequently informed of the need for more shipments; (5) that plaintiff

expected monthly shipments of 83,000 bottles; (6) that defendant did not provide those

shipments; and (7) that plaintiff's president was frustrated.  (*Id*. at 3-4.)

The contract states:

"4) [Plaintiff] will have contract period of 5 years.  After 1 year from the
business commencement, orders for one million dollar or more must be
placed, each year.  As a general rule, inventory payment of [defendant's]
Water will be paid in advance.

5) [Plaintiff] will need to place its orders, in writing, normally 3 months in
advance.  Ex-factory price is determined at US $1 per 1L bottle."

(Def.'s Trial Ex. 1.)  Smith's contention that defendant was behind its "contractually-

defined" shipments was thus baseless; the contract defines no shipment requirement.  As

to the remaining contentions, evaluating their truth requires no specialized knowledge

and such evidence was therefore not the proper subject of expert testimony.  The

determinations of whether defendant was informed of the need for more shipments,

whether plaintiff expected more shipments, or whether plaintiff's president was frustrated

by the lack of more shipments did not require the assistance of an expert on contract

construction.  These were factual issues that were to be determined by evaluation of the

11

evidence and witnesses at trial.  Because the opinion misstated facts as well as usurped the jury's role, Smith's testimony on this point was excluded.

Smith's second opinion, that the contract required exclusive dealing and provision to plaintiff of 100 percent of factory output, (Smith Report at 5), was also excluded.  His factual basis for the opinion, language in the earlier 2004 contracts that the Court ruled were admissible only to provide background, did not exist.  Despite Smith's claim that they did, none of the contracts in question contained the word "exclusive," any word derived therefrom, or any language of exclusivity.  (*See* Pl.'s Trial Ex. 2, Pl.'s Trial Ex. 3, Def.'s Trial Ex. 1.)  Because Smith's first and second pieces of evidence as to why the contracts created exclusive dealerships for 100 percent output were predicated on indisputably false claims, that evidence could not bolster his conclusion's reliability.

Smith's third element of evidence was his contention that paying cash to obtain a distributorship "strongly supports" that plaintiffs were "the exclusive distributor and/or had a 100% output contract." (Smith Report at 5 ¶ 3).  This statement, however, based solely on Smith's "experience and expertise," (*Id*. at 5 ¶ 3 n.10), could not be accepted as reliable.  The entirely unsupported statement demonstrated no intellectual rigor and was not grounded in any authority.  The Report provided no basis for testing the statement other than the Court's own research and the Court could find no law saying that merely paying money to obtain a distributorship creates an exclusive distributorship "and/or" a 100 percent output contract.

Smith's fourth piece of evidence was defense counsel's "admission" that, as a practical matter, almost 100 percent of output would be sold to plaintiffs.  (*Id*. at 5 ¶ 4.) That "admission," however, was entirely mischaracterized.  Defense counsel was

12

explaining that *despite that* virtually 100 percent of output would be allocated to the contract, the contract *was not* an output contract and *did not* require exclusivity.  (Tr. of Conference of Oct. 22, 2007 at 12.)

Smith's third opinion was that defendant violated plaintiff's exclusivity and trademark rights.  (*Id*. at 6-7.)  As to the exclusivity rights, Smith's opinion was entirely predicated on the "fact," (Pl.'s Mot. In Limine Opp'n at 3), that the contract created an exclusive distributorship.  (Smith Report at 6.)  Considering, as demonstrated above, that Smith's opinion that that relationship existed was unfounded, this opinion also lacked reliability.  As to the trademark rights, how advertisements in New Jersey affected water sales in Korea was unclear.  (*See Id*. at 7.)[1]  However, should it have been true that defendant used plaintiff's trademark in some unlawful manner, then an expert's opinion as to whether that infringement cost plaintiff sales might have been relevant to plaintiff's measure of damages.  But because the Court found that Smith's fifth opinion, that placing plaintiff's economic loss at $133 million, was unreliable, the Court excluded this testimony as well.  Any relevance the evidence had on damages could easily have come in through fact witnesses.[2]

Smith's fourth opinion that plaintiff did not demand that defendant provide half-liter bottles instead of full-liter bottles was also excluded.  (Smith Report at 8.)  The opinion was based entirely on examinations of plaintiff's sales and marketing plans and of deposition testimony.  (*Id*.)  Reaching it required no specialized knowledge and usurped the jury's role as fact-finder.  *See Fosamax*, 645 F. Supp. 2d at 173.  Furthermore, an expert witness is prohibited from testifying on matters beyond the scope

---

[1] The pages of deposition testimony cited by Smith were not provided in any submission from either party.
[2] Defendant of course was not being sued for trademark infringement but for breach of contract.

of the expertise for which he was retained because of the obvious danger of wrongly swaying the jury. *See Mejia*, 545 F.3d at 192. Smith was retained to opine on contract construction, marketing, and economic loss issues. The questions whether plaintiff did or did not make this request, and how strong that request was or was not, were irrelevant to those opinions.

### B.      Smith's Damages Calculation Was Excluded

Smith's final opinion was that plaintiff suffered $133,293,878 in economic losses due to defendant's breach. (Smith Report at 9.) Each bit of evidence Smith cited in reaching that figure was, however, speculative, contradictory, or unreliable.

First, Smith assumed (1) that plaintiff's shipment requirements would increase from one million per year in the first year to three million in the fifth, and (2) that the parties would have renewed the contract for five additional years. Smith had no evidence whatsoever that the contract would be so renewed, and Smith's opinion on the shipment increase contradicted his "evidence" for his first opinion that formal purchase orders were not necessary (that being that the contract called for a shipment requirement of exactly one million bottles per year). (*Id*. at 3, 9.) Second, Smith's anticipation of demand growth from one to three million bottles of water per year was doubtful when of the around 300,000 bottles provided under the contract in the first year, only half were actually sold while the other half were given away for free, and sales were made only by salesmen going door-to-door. (Dep. of Jeong Hee Kim, President of Ho Myung Moolsan, dated August 20, 2008 at 110-12.) Third, Smith's allegation that after achieving this success in Korea plaintiff would take the mineral water markets of the

United States and Mexico by storm was supported by no cited authority and seemed unreasonable considering the weakness of plaintiff's sales in Korea.  (Smith Report at 11.)  Fourth, as a start-up company pursuing a new business venture, "[e]vidence of lost profits . . . receives greater scrutiny because there is no track record upon which to base an estimate."  *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).  Indeed, lost profits calculations for new ventures that "rest on a series of assumptions and projections" are generally unreliable.  *See Dupont Flooring Systems, Inc. v. Discovery Zone Inc.*, No. 98 Civ. 5101 (SHS), 2004 WL 1574629, at *7 (S.D.N.Y. July 14, 2004).[3]

Fifth and most importantly, and precisely because new ventures' lost profits claims must be judged with special scrutiny, that Smith's Report relied on no documentary evidence of any actual sales compelled the Court to exclude this testimony. Under the N.Y.U.C.C., an aggrieved buyer may recover lost profits as consequential damages under section 2-715.  *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1063 (S.D.N.Y. 1996).  To be recoverable, however, these losses must have been (1) caused by seller's default, (2) contemplated by the parties, and (3) provable with reasonable certainty.  *Id*. at 1064.  The third element requires that "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain."  *Id*. at 1066 (quoting *Kenford Co., Inc. v. Erie County*, 493 N.E.2d 234, 235 (N.Y. 1986)). Specifically, "[buyer] must produce some proof that it would have been able to sell [the product] at the purported prices and in the predicted quantity."  *Id*. at 1068.  Sales records and data are acceptable proof.  *Id*.  A court should be "hesitant[, however,] to rely on stated assumptions as to the [amount of product] that would have been sold and the prices

_____

[3] The critical newness is not of the business itself or of the logistical foundations for sales, but for the attempt to sell a new product.  *Coastal Aviation Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1068 (S.D.N.Y. 1996).

at which they would have been sold." *Id*.  Though lost profits calculations may, in part,

rely on assumptions *based on documentary support*, experts' opinions on such

calculations are excludable when "wrought with unsupported and speculative

assumptions" of future prices, sales figures, and transactions undertaken between and

individually by the parties with no documentary bases.  *Id*. at 1068-70.  Indeed, "[t]o

award [a buyer] lost profits based on the unproved assumption that it would have sold at

list price [all product] it had agreed to purchase would unjustly reward [that buyer] rather

than make it whole."  *Id*. at 1070.

Here plaintiff offered no documentary evidence establishing that it made even a

single sale.  At the final pretrial conference the Court asked plaintiff's counsel no fewer

than seven times for sales figures, revenue lines, or business ledgers.  (Tr. of Hr'g of Oct.

21, 2010 at 32-35.)  At best, plaintiff's counsel offered *projections* of sales.  (*See Id*. at

32.)  Counsel additionally explained that bookkeeping standards and practices in Korea

differ from United States standards.  (*Id*. at 33.)  However, to the Court's simple question

of: "What exhibit [does plaintiff] have that establishes the sale?" counsel answered,

"Judge, I'm not able to specifically point to any document."  (*Id*. at 34.)  Furthermore,

counsel continued to offer non-responsive answers to the Court's inquiries into (1) the

markup from a $1 per bottle purchase price to a $15 resale price (in other words a markup

of fifteen-hundred percent), and (2) the fact that other mineral water was selling in Korea

for $0.60 to $1.10.  Counsel stated that the sales price used by Smith to calculate lost

profits was, unsurprisingly, the plaintiff's sales price.  (*Id*. at 38.)  And counsel stated that

plaintiff's water was priced twenty-five hundred to thirteen-hundred percent higher than

other mineral water on the Korean market because its water was matched by "no other

water in the world."  (*Id*. at 37.)  In other words, plaintiff's counsel could, like Smith, point to no documentary evidence attesting to the Report's reliability.  With such a lack of foundation, including a lack of any independent research, Smith's Report stood for nothing more than the Court's characterization of it as:  "My client tells me I can sell three million bottles and get fifteen dollars a bottle."  (*Id*. at 39.)

If plaintiff were an established company pursuing business for which it had extensive experience or records of sales, Smith's conclusions regarding lost profits might have satisfied reliability.  But because (1) the requirements for proving a new venture's economic losses are more strict; (2) the entire predicate for Smith's lost profits opinion was already excluded as unreliable, contradictory, or improper for expert testimony; and (3), the Report was based on no evidence of any actual sales activity; the Court excluded Smith's ultimate opinion that plaintiff lost $133 million in profits due to defendant's alleged breach.[4]

---

[4] After the Court's decision to preclude Smith's Report, plaintiff moved for reconsideration.  Plaintiff argued, again, that an expert may rely on assumptions in reaching his conclusions.  Plaintiff also referred the Court to several documents, prepared *after* the events leading to this litigation occurred, purporting to be sales projections.  Beyond doubt, an expert may rely on assumptions.  The Court's reason for denying Smith's Report was not that it relied on assumptions, but that those assumptions were entirely unfounded and unreliable, and that that reliance was therefore misplaced.  Moreover, and as explained more extensively below, the documents provided with plaintiff's motion were themselves unreliable and provided no support for Smith's assumptions.  Plaintiff did not identify any controlling law or facts that the Court overlooked in reaching its decision to exclude Smith's testimony.  Therefore plaintiff's motion for reconsideration was denied.  *See Finkelstein v. Mardkha*, 518 F. Supp. 2d 609, 611 (S.D.N.Y. 2007).

**IV.    Plaintiff's Exhibit PX 90A.14, Compiled Of Documents Prepared After Litigation Began, Was Excluded**

Plaintiff offered its original exhibit 90A.14 to support its lost profits claim.  The exhibit consisted of five pages of documents.  The first, bates stamped 165, was a sales plan chart for the years 2006-2010.  (Pl.'s Original Trial Ex. 90A.14 at 1 ("Doc. 165").) The second, page-numbered 167, purported to be plaintiff's parent company's sales status of purchased mineral water.  (*Id*. at 2 ("Doc. 167").)  The third, page-numbered 166, purported to be plaintiff's sales plan and expenses post-2006.  (*Id*. at 3 ("Doc. 166").)  The fourth, bates stamped 167, was a Korean-language version of Doc. 167; and the fifth, bates stamped 166, was a Korean-language version of Doc. 166.  (*See id*. at 4-5.)

A document prepared after the events leading to the litigation took place, and for litigation purposes, without any independent indication of reliability, is often inherently unreliable and may be excluded.  *See Broga v. Northeast Utilities*, 315 F. Supp. 2d 212, 228 (D. Conn. 2004).  Business records specifically, though admissible hearsay, may be excluded when their source, information, or method of preparation appears unreliable. Fed. R. Evid. 803(6).

Doc. 165 was entitled "Sales Plan" and contained a chart of sales numbers, broken down by month, from 2006 through 2010.  (Doc. 165.)  Because the chart extended at least three years after litigation began, at least the majority of it appeared to be projections or plans, and not records of sales actually made.  Furthermore, plaintiff admitted that only half of the 300,000 bottles provided under the contract were actually sold.  Thus, the 2006 and 2007 stated sales figures, 1,000,000 and 1,596,672 respectively,

must have also been projections rather than records.  (*Id.*)  Below those numbers, a line

of text stated: "ESTIMATED TOTAL LOSS FROM SALES : $ 80,349,304.00".  (*Id.*)

At trial, out of the jury's presence, the Court questioned plaintiff's counsel as to that

bottom line.  (Tr. of Trial of October 25, 2010 at 86-87.)  Plaintiff's counsel admitted that

that line was placed in the document after litigation began, and that the document

containing the original chart was not produced.  (*Id*. at 87-88.)  The Court thus excluded

Doc. 165 as unreliable in both that it was prepared after litigation began and in that it

appeared to contain no factual matter recording sales that actually occurred.

Doc. 167 was excluded for much the same reasons.  Plaintiff's counsel conceded

that document was a summary, prepared after litigation began, supposedly based on

"voluminous" sales documents that still existed in Korea.  (*Id*. at 104-06)  This admission

was somewhat perplexing considering defense counsel's pre-trial requests, made at least

twice in writing, for documents either establishing actual sales or going to plaintiff's

damages calculation.  (*See* Defendant's First Request For Production Of Documents

dated Dec. 27, 2007 ¶ 36; Letter of Defense Counsel Michael J. Stacchini dated Sept. 3,

2008 ¶ 18.)  The "voluminous" sales records, however, were never produced.  Because

Doc. 167 seemed to be a summary, prepared after litigation began, of sales records that

themselves clearly would have been responsive to defendant's discovery requests yet

were not produced, the Court excluded this document.

Doc. 166 was excluded for the same reasons as Doc. 167.  The Court noted

additionally, however, that a legal fee figure was written directly on this document under

the heading "Expenses."  (Tr. of Trial of October 26, 2010 at 106.)  When questioned,

plaintiff's counsel admitted that that figure represented his fees for this litigation. (*Id.*) Therefore the document, even facially, was prepared after litigation began.

## V.      Defendant's Rule 50(a) Motion That Plaintiff Cannot Establish Lost Profits Was Granted

Federal Rule of Civil Procedure 50(a) allows a party to move for judgment as a matter of law on a particular issue.  After the opposing party has rested its case, the movant requests a judicial determination that the opposing party cannot make a claim on a specific issue when taking all facts presented by the opposing party as true.  Fed. R. Civ. P. 50(a).  The court must find that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant] on the issue." *Id.*

As stated above, the lost profits of a new business venture must be established with an especially high level of certainty. *Schonfeld*, 218 F.3d at 172 (2d Cir. 2000).  A plaintiff claiming lost profits must "produce some proof that it would have been able to sell [the product] at the purported prices and in the predicted quantity." *Coastal Aviation*, 937 F. Supp. at 1068.  Though records of actual sales can be proof going to lost profits, courts cannot rely merely on assumptions as to sales' quantity and price. *Id.*

Plaintiff could offer no expert testimony going to its lost profits claim.  Plaintiff was thus forced to rely on its documentary evidence and its fact witnesses to establish those losses' existence.  When offering testimony helpful to the jury and based personal knowledge, company management may express lay opinions regarding the existence and the amount of lost profits. *Barclays Capital Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 342 (S.D.N.Y. 2010).  At the same time, the witness must be able to point to

objective bases for his opinions.  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 321 n.4 (S.D.N.Y. 2009).  The Second Circuit has not articulated a clear standard in this regard, but the cases cited, and others, suggest that at a minimum the witness must be able to point to some sales data or independent market report indicating that the business venture could make sales and be profitable.  Other circuits, moreover, have employed a similar standard.  *See US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 689 (8th Cir. 2009) (finding no error in the district court's exclusion of the company president's lost profits testimony, based only on the company's own sales projections); *Von Der Rurh v. Immtech Int'l Inc.*, 570 F.3d 858, 861-63, 866 (7th Cir. 2009) (finding no error in the district court's exclusion of the company president's lost profits testimony and in that court's preclusion of plaintiff's lost profits theory because the testimony merely stated an expectation of future profits without any data or analysis for support).

Plaintiff's evidence going to lost profits, offered through their witness Jeong Hee Kim, president of the company, consisted of wildly speculative sales projections and was supported neither by data of actual sales nor by independent market research.  Kim testified that plaintiff planned to sell its customers each two bottles of $15 mineral water, in a highly competitive market where other mineral water seemed to be selling for between $0.60 and $1.10, every day, apparently *ad infinitum*, by going door-to-door and explaining the water's medicinal properties.  (Tr. of Trial of October 26, 2010 at 143-45; Kim. Dep. at 108-12; Pl.'s Original Trial Ex. 90A attach. 5; Pl.'s Trial Ex. 90A.15.)  This "plan" served as the basis for all of plaintiff's sales charts and projections.  Plaintiff did not, however, provide a single document firmly establishing that it made even one sale.

Indeed, as mentioned above plaintiff's counsel admitted he could not "specifically point" to any document confirming a single sale.  (Tr. of Hr'g of Oct. 21, 2010 at 34.)  Based on this record consisting solely of speculation and projection, the Court could not take as especially certain either the existence or the amount of plaintiff's lost profits.  A reasonable jury not having sufficient evidence to find for plaintiff on its lost profits claim, the Court granted defendant's Rule 50(a) motion for judgment as a matter of law on that issue.

Plaintiff pointed the Court to the "Wrongdoer Rule."  This principle states that a party in breach of contract cannot escape damages because the amount of damages is uncertain.  *Boyce v. Soundview Tech. Grp. Inc.*, 464 F.3d 376, 392 (2d Cir. 2006); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977).  When a plaintiff proves a breach and provides a reasonable estimate of the damages that flowed from the breach, the burden is on defendant to overcome any uncertainty and establish a more definite damages amount.  *Boyce*, 464 F.3d at 392.  However, in a lost profits scenario, because the existence of damages is in question instead of the amount of damages, the wrongdoer rule applies *only after* plaintiff has established the damages' existence with the requisite level of certainty.  *Schonfeld*, 218 F.3d at 174-75.  Thus the burden to clarify any uncertainty as to the damages amount would have shifted to defendant if, and only if, plaintiff had established with an especially high level of certainty and based on documentary evidence that it suffered lost profits.  *See Point Productions A.G. v. Sony Music Entertainment, Inc.*, 215 F. Supp. 2d 336, 346 n.5 (S.D.N.Y. 2002).  Because plaintiff here had not proved the existence of lost profits,

defendant had no burden to clarify those losses' amount and the Court's granting of defendant's Rule 50(a) motion on lost profits was not disturbed.

## VI.    Plaintiff's Application To Seek "Lost Sales" Damages Was Denied

After ruling that plaintiff was unable to prove lost profits as a matter of law, the Court requested that plaintiff provide a statement of the damages it was still seeking. Plaintiff provided the Court with a Statement and Computation of Damages seeking (1) amounts prepaid under the contract, and (2) "a range of lost sales between A. $2,494,000.00 for 10 containers ordered through July 2007; or B. $60,000,000.00 for four years of contract term, through this year, at the rate of one million minimum bottles at $15.00 per bottle."  (Pl.'s Statement of Damages dated Oct. 28, 2010 at 1 (emphasis in original).)

The Court could find no authority, and plaintiff provided none, stating that "lost sales" refers to anything different from "lost profits" or that those concepts would be analyzed in a different manner.  Therefore, for the same reasons that the Court precluded plaintiff from seeking lost profits, the Court precluded plaintiff from seeking any damages of "lost sales."

## VII.    Plaintiff Was Precluded From Seeking To Recover The $500,000 It Claims It Paid To Mr. Young-Gil Jee Pursuant To The Contract

Plaintiff included in its Statement of Damages calculations "$2 million for on [sic] money prepaid."  (Pl.'s Statement of Damages dated Oct. 28, 2010 at 1.)  This amount apparently included $1 million plaintiff paid for the right to resell water in

Korea.[5]  Defendant claimed, however, to have received only $500,000 for the distribution right.  And plaintiff has represented that it gave a $2 million total payment to one Mr. Young-Gil Jee, an agent of the sole shareholder of plaintiff company.  (Compl. in *Ho Myung Moolsan v. Young-Gil Jee*, 07 CV 4004 (DMC) (D.N.J. 2007) ¶ 24.)  Plaintiff represented that Jee "embezzled the difference of $500,000."  (*Id*.)

The Court ruled that of the $500,000 allegedly stolen by Jee, plaintiff was entitled to no recovery from defendant.  The Court allowed testimony concerning the non-operative contracts and transactions made between plaintiff and Jee and between Jee and defendant for background purposes only.  (Tr. of Hr'g of Oct. 21, 2010 at 27.)  The Court stated numerous times that the issue for trial was defendant's alleged breach of contract and not the fraud perpetuated by plaintiff's agent.  (*Id*. at 25, 27.)  Indeed, plaintiff's counsel agreed to offer evidence pertaining to the stolen $500,000 only to "show how much value we paid for the water rights."  (*Id*. at 19.)  And to the Court's statement, "[Y]ou're not seeking the recover that allegedly fraudulent payment of $500,000 from [defendant]," plaintiff's counsel answered, "No."  (*Id*.)

Moreover, as a matter of law, defendant cannot be held responsible for the stolen $500,000.  The current action was for breach of contract.  Contract damages are those proximately caused by the breach.  In other words, damages, including consequential damages, must be natural and reasonably foreseeable results of the breach.  *See Marjan Int'l Corp. v. V.K. Putnam, Inc.*, No. 92 Civ. 8531 (BN), 1993 WL 541204, at *11 (S.D.N.Y. 1993); 24 Williston on Contracts § 64:12 (4th ed.).

---

[5] The contract requires plaintiff to pay $500,000 for the right to resell or distribute water in Korea and $1 million as an advance on water shipments.  (Def.'s Trial Ex. 1.)  In two earlier non-operative versions of the contract (versions signed not by plaintiff and defendant but by defendant and Mr. Jee, an agent of plaintiff company's sole shareholder) the payment for the distribution right was stated first as $500,000, and later as $1 million.  (Pl.'s Trial Exs. 3A & 2A.)

The contract breach alleged in this case occurred sometime in the early months of 2007.  But Jee's theft occurred in December 2004.  (Compl. in *Ho Myung Moolsan v. Young-Gil Jee*, 07 CV 4004 (DMC) (D.N.J. 2007) ¶ 24.)  In other words, the theft occurred over a year before the breach.  That the loss of funds due to the theft could have been caused by the breach thus was highly unlikely.  Indeed, had the contract never been breached and had these parties never found themselves in litigation, plaintiff would still have lost the stolen $500,000 due to Jee's fraud.  In other words, the alleged breach of contract had no effect on the loss of the $500,000 in question.

Furthermore, proximate causation requires that the damages be reasonably foreseeable and that imposing liability be fair.  *In re Terrorist Attacks on September 11, 2001*, ___ F. Supp. 2d ___, No. 03 MDL 1570 (GBD), 2010 WL 2484411, at *28 (S.D.N.Y. 2010); 24 Williston on Contracts § 64:12 (4th ed).  To have found defendant liable for any of the missing $500,000 would have been to hold defendant liable for the wrongful actions of the agent of plaintiff's shareholder.  But the machinations of plaintiff's owner's agent seem entirely unforeseeable to defendant, and indeed perhaps foreseeable to plaintiff.  To hold defendant liable for Jee's fraud would have been entirely unfair considering both that unforeseeability and that defendant was not implicated in the alleged fraud.  Because of that lack of proximate cause, plaintiff could not seek recovery of the $500,000 stolen by Jee from defendant.

## VIII.   Plaintiff's Motion To Amend Its Complaint To Include Claims For Fraud In The Inducement And For Negligent Misrepresentation Was Denied

During trial plaintiff moved under Federal Rules of Civil Procedure 15(a) and 15(b) to amend its complaint to include claims for fraud in the inducement of the contract and for negligent misrepresentation.  These proposed amendments were based on certain answers elicited by plaintiff's counsel through his cross examination of defendant's witness Mr. Nam-in Jhon.

As a preliminary matter, plaintiff's motion under Rule 15(a) was denied because that rule only allows amendments proposed before trial begins.  Plaintiff's motion under Rule 15(b) was also denied.  Rule 15(b) reads in pertinent part:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.

Fed. R. Civ. P. 15(b)(2).  Plaintiff appeared to argue implied consent:  "this testimony was played out in front of the Court and the jury . . . , defendant knew or had to have known [of the testimony's subject matter] . . . [and] [t]he testimony developed today has always been available to the defendant."  (Pl.'s Mot. To Amend Its Complaint dated Oct. 27, 2010 at 2-3.)  Rule 15(b) motions are "intended to correct the theory of an existing claim and not to assert new and different claims."  *Timex Licensing Corp. v. Advance Watch Co., Ltd.*, No. 3:07-cv-01731 (VLB), 2010 WL 3169342, at *2 (D. Conn. Aug. 10, 2010).  In other words, Rule 15(b) is meant "to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record."  *Browning Debenture Holders' Committee v. DASA*

*Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977).  A party's implied consent can be found in,

for example, actually litigating an issue, prompting witness testimony on the issue,

briefing the issue, or raising the issue at oral argument.  *See*, *e.g.*, *McQueen-Starling v*

*.UnitedHealth Group, Inc.*, 654 F. Supp. 2d 154, 168 (S.D.N.Y. 2009); *Dickerson v.*

*Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010); *Timex*, 2010 WL 3169342, at *3.[6]

When a party's implied consent is based on evidence presented at trial, that

consent requires ongoing discussion of that issue at trial or unobjected introduction of

evidence on the point by the opposing party.  *Christoforou v. Cadman Plaza North, Inc.*,

No. 04 CV 08403 (KMW), 2009 WL 723003, at *5 (S.D.N.Y. Mar. 19, 2009).  The

Second Circuit warns, however, that district courts should be cautious in inferring

consent due to notice and procedural due process requirements.  *Id*. at *6 (citing *Grand*

*Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir. 1985)).  Thus a party's

alleged consent by failure to object only arises when, in addition to being unobjected-to,

the issue in question "was raised in a sufficiently clear and unambiguous way."  *Id*.

(citing *Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1089-90 (2d Cir.

1986)).  Consent is not implied through an alleged "understanding" between the parties or

through, for example, statements in responsive Local Rule 56.1 Statements.  *Id*.  Indeed, a

Rule 15(b) motion on a collateral issue based on implied consent is a *narrow exception* to

the "established procedural principle that a party's failure to include a legal theory . . . in

the pre-trial order results in its subsequent abandonment or waiver."  *Id*. (citing *Kozera v.*

*Int'l Bhd. of Elec. Workers, AFL-CIO*, 230 F. Supp. 2d 413, 416 n.3 (S.D.N.Y. 2002).

Presumably, then, an adverse witness's answer on cross examination, given after an

---

[6] Plaintiff made no claim that defendant *expressly* consented to try the issue and indeed no such consent appears anywhere in the record.

overruled objection, and without any indication whatsoever that the questioning lawyer is raising or intends to raise the unpleaded legal claim, does not operate as a consent to try that issue.

In this case, plaintiff's counsel questioned one of defendant's witnesses, Jhon, as to the amount of water defendant's factory was producing.  (Tr. of Trial of Oct. 27 at 299-301.)  The questioning occurred in plaintiff's attempt to prove that defendant breached the contract by failing to fill certain orders.  That defendant allegedly made misrepresentations as to the plant's capacity at the time the contract was negotiated was neither clearly nor unambiguously raised, nor indeed raised at all either in plaintiff counsel's presentation or in the pre-trial order.  Thus defendant's implied consent was lacking.

The Court denied plaintiff's motion for additional reasons.

First, the factual basis for the claims was flawed.  Plaintiff contended these claims arose at trial because Jhon testified to certain factory problems causing defendant's production capacity to be limited to approximately 65,000 bottles per month or 780,000 per year.  (Pl.'s Mot. To Amend Its Complaint dated Oct. 27, 2010 at 2.)  This statement arguably gave rise to claims for fraud in the inducement and for negligent misrepresentation because, though plaintiff mentioned it nowhere in the motion, defendant allegedly knew it could not meet the contract's one-million bottle-per-year minimum production requirement.  But the contract contained no such requirement for the first year, only for years two through five.  Any plant and machinery problems defendant had during the first year of production did not preclude defendants from

producing future contract minimums, particularly in light of defendant's plans to install a second production line.

Second, no evidence had been presented regarding many of the elements of plaintiff's new claims.[7]  Accordingly, since plaintiff could not establish a claim of either fraud in the inducement or negligent misrepresentation the amendment would have been futile and was denied for this reason as well.  *Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009).

Third, the fraud in the inducement claim had been alleged, and disposed of twice in this litigation.  Plaintiff's original complaint contained a claim for fraud in the inducement of the contract based on defendant's representations, made before the contract was executed, "that [defendant] [was] fully capable of providing as much water as plaintiff[] required for sale and distribution anywhere including the United States and Korea."  (Compl. ¶ 44.)  Plaintiff claimed then that this was fraud because defendant withheld its knowledge that it "did not have a water production plant that was viable." (*Id*. ¶ 45.)  The Court dismissed the claim because plaintiff failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).  (Order of Dec. 20, 2007 at 1; Tr. of Conf. of Dec. 20, 2007 at 4.)  Thereafter, plaintiff again attempted to plead fraud in the

---

[7] Fraud in the inducement of a contract requires: "(1) that the defendant made a representation; (2) as to a material existing fact; (3) which was false; (4) and known to be false by the defendant; (5) that the representation was made for the purpose of inducing the plaintiff to rely upon it; and (6) that the plaintiff reasonably did so rely; (7) in ignorance of its falsity; (8) to his injury."  *Rojo v. Deutchsche Bank*, No. 06 Civ. 13574 (HB), 2010 WL 2560077 at *4 n.8 (S.D.N.Y. June 23, 2010).  Negligent misrepresentation requires that: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Travelers Cas. & Sur. Co. v. Dormitory Authority-State of New York*, ___ F. Supp. 2d ___, No. 07 Civ. 6915 (DLC), 2010 WL 3199861, at *8 n.18 (S.D.N.Y. Aug. 11, 2010).

inducement by amending its complaint.  By order dated September 29, 2009, Magistrate

Judge Pitman denied the motion as futile.  Beyond (1) lacking the requisite particularity;

(2) failing to show falsity; (3) failing to show reliance; and (4) failing to show damages;

the court additionally found that the fraud in the inducement claim was merely a

masquerading breach of contract claim.  *Ho Myung Moolsan*, 665 F. Supp. 2d at 253-54.

Plaintiff's final attempt at trial to assert a fraudulent indirect claim fails for the same

reasons.


## CONCLUSION

The Court thus disposed of the issues presented above for the reasons stated

above.


SO ORDERED.


Dated:  New York, New York
        December 2 , 2010

                                      Richard J. Holwell
                                United States District Judge