UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HO MYUNG MOOLSAN, CO., LTD.,

                          Plaintiff,

      -against-

MANITOU MINERAL WATER, INC.,

                          Defendant.

07 Civ. 07483 (RJH)

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

On August 23, 2007, plaintiff Ho Myung Moolsan ("Moolsan") sued defendant Manitou Mineral Water ("Manitou") for breach of contract and related claims arising out of a failed contract for the sale of mineral water. After trial in late October 2010 on the breach of contract claim, a jury returned a unanimous verdict for Manitou on liability. Now before the Court is Moolsan's timely motion for judgment as a matter of law, for a new trial, and for other post-verdict relief. For the reasons stated below, Moolsan's motion is denied in its entirety.

## I. FACTUAL SETTING

### A. Background

In 1982, Kang Hyun-Song ("Kang")[1] started a cosmetics company called Hwa Jin in South Korea ("Korea"). (Tr. of Trial (hereinafter "Trial Tr.") at 21-23.) By the mid-2000s, Kang had established several companies and employed, in total, approximately 800 "in the company" employees, and an "outside" sales force of approximately 75,000.

---

[1] In South Korea, one's family name is typically said or written first, followed by one's given name.

1

(*Id*. at 24.)  In 2004 or 2005, one of Kang's agents, Jee Young-Gil ("Jee"), introduced Kang to a business opportunity involving Manitou Springs Mineral Water (the "Water") sold by Manitou.  (*Id*. at 24-27.)  Manitou's Chief Executive Officer ("CEO") was Kwon O-Yoon ("Kwon").  (*Id*. at 372.)  Its Water factory in Colorado was run by Jhon Nam-In ("Jhon").  (*Id*. at 252.)  To contract with Manitou and eventually to sell the Water in Korea, Kang formed Moolsan.  (*Id*. at 24.)  In January 2005 Kang made Kim Jeong-Hee ("Kim"), a woman who had run several of Kang's other companies, president of Moolsan.  (*Id*. at 44-45.)

On December 1, 2005, Moolsan and Manitou executed a contract, in essence, for the sale of Water.  (*See* Pl.'s Trial Ex. 16A (hereinafter the "Contract").)  Manitou sold a distribution right to Moolsan for $500,000 and agreed to sell Water to Moolsan for $1 per one-liter bottle.  (*Id*. ¶¶ 3, 5.)  Moolsan made an advance payment of $1 million for mineral water inventory for the first year, and after the first year was required to order a minimum of $1 million worth of Water each year.  (*Id*. ¶¶ 3, 4.)  Moolsan was required to pay for orders in advance, and additionally "to place its orders, in writing, normally 3 months in advance."  (*Id*. ¶¶ 4, 5.)  The contract was to run for five years.  (*Id*. ¶ 4.)

Manitou initially shipped Moolsan around 307,000 bottles of water.  (Trial Tr. at 144-45.)  Moolsan used Hwa Jin's pre-existing sales force of 75,000 to advertise the Water by word-of-mouth and sell it door-to-door for $15 per bottle.  (*Id*. at 141, 145-47.)  Moolsan disposed of the entire initial amount of Water, but only about half was sold while half was given away for free in promotional efforts.  (*Id*. at 145-47.)

Moolsan alleged that it placed several orders for a total of eight "containers" of Water from Manitou in January, February, and March of 2007, but that those orders went

unfilled.  (*Id*. at 124-25.)  Each "container" contained approximately 16,632 one-liter bottles; accordingly eight containers totaled 133,056 bottles of Water.  (*Id*. at 125, 282.)  Though Moolsan alleges it placed the purchase orders dated January 23, 2007; January 30, 2007; February 6, 2007; February 13, 2007; and March 6, 2007 (the "Original Orders"); Manitou claimed it never received those orders.  (*See id*. at 277-78.)  Moolsan, however, complained to Manitou of its perceived failure to fill the orders by fax dated May 30, 2007.  (*Id*. at 125-26; *see also* Pl.'s Trial Ex. 37A.)  Manitou replied by fax dated June 1, 2007, and requested that Moolsan reorder the eight containers at issue.  (Trial Tr. at 125, 278; *see also* Pl.'s Trial Ex. 38A.)  Moolsan did submit, and Manitou received, a reorder dated June 5, 2007 (the "Reorder").  (Trial Tr. at 126, 279-80; *see also* Pl.'s Trial Ex. 39A.)  Manitou also alleged that, starting as early as 2005, and through 2006, Moolsan inquired into the possibility of Manitou selling it half-liter bottles instead of one-liter bottles.  (Trial Tr. at 267-72.)  Manitou perceived these inquiries as "Moolsan want[ing] 500 milliliter [bottles]."  (*Id*. at 270.)  Manitou alleged that it began construction of machinery to accommodate half-liter bottling in the spring and summer of 2007, and that it advised Moolsan of the expense and time necessary to complete the construction and factory renovations.  (*Id*. at 269-76.)  Moolsan denied ever having made a request that Manitou renovate its factory or sell it half-liter bottles.  (*Id*. at 111-12, 179.)

In any event, Moolsan never received any Water from Manitou after the end of April 2007.  (*Id*. at 123-24.)  After a tumultuous spring and summer, on August 29, 2007, Manitou sent Moolsan a fax indicating its readiness to resume water shipments upon Moolsan's order.  (*Id*. at 284-85; *see also* Def.'s Trial Ex. 11.)  Moolsan, however, had filed suit in this Court on August 23, and accordingly replied by letter dated August 30,

3

2007, requesting Manitou to direct all further communications to Moolsan's lawyer. (Trial Tr. at 285; *see also* Def.'s Trial Ex. 12.)

**B.  Procedural History**

Moolsan filed this lawsuit on August 23, 2007, asserting breach of contract, fraud, and related claims against Manitou, Kwon, and several other parties.  Moolsan also sought an injunction prohibiting Manitou from selling or providing Water to any party other than Moolsan, and ordering Manitou to provide Moolsan with all the water its factory produced.  (*See* Tr. of Hr'g of Oct. 22, 2007 (hereinafter "Oral Arg. Tr.") at 14-15.)  The Court denied that motion from the bench on October 22, 2007.  (*See id*. at 18-21.)

After several rounds of motion practice, Moolsan's sole remaining claim—that for breach of contract against Manitou—was tried before a jury from October 25 to November 1, 2010.  Before and during trial, the Court ruled on several motions and applications from the parties.  Those rulings included holding that the Contract was an installment contract and not an output contract, and excluding the testimony and report of Moolsan's damages expert and certain of Moolsan's trial exhibits relating to its claimed lost profits.  These rulings, and others, are summarized in the Court's first post-trial opinion, *Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, No. 07 Civ. 7483, 2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010).  At trial Moolsan called Kang, Kim, and Bob Lee, the manager of Moolsan's United States branch.  Manitou called Jhon and Kwon.  These witnesses testified to the facts as set forth above.

On November 1, 2010, the jury returned a unanimous verdict for Manitou on liability for breach of contract.  (*See* Trial Tr. at 523-24.)  Specifically, the jury found that for neither the Original Orders nor the Reorder did Manitou "default in fulfilling [those orders], thereby substantially reducing the value to [Moolsan] of that shipment." (Stacchini Decl. Ex. B (hereinafter the "Verdict Form"); *see also* Trial Tr. at 523-24.) The Court entered judgment on December 13, 2010, and Moolsan timely filed this motion on January 11, 2011.

## II.  DISCUSSION

Moolsan makes four requests in its motion for post-verdict relief: (1) for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b); (2) for a new trial pursuant to Federal Rule of Civil Procedure 59(a); (3) for disgorgement of certain funds; and (4) for sanctions.  The Court addresses each request in turn.

**A.  Renewed Motion for Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50(b) allows a party to "renew" a Rule 50(a) motion for judgment as a matter of law which was made before the case was submitted to the jury.  *In re Fosamax Products Liability Litig.*, 742 F. Supp. 2d 460, 469-70 (S.D.N.Y. 2010); *see* Fed. R. Civ. P. 50(a), (b).  The grounds on which a party may rely in a Rule 50(b) motion, however, are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]."  *Fosamax*, 742 F. Supp. 2d at 470 (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998)).  "[T]he movant is not permitted to add new grounds after trial."  *Galdieri-Ambrosini*, 136 F.3d at 286.  Thus, in

5

the recent words of the Supreme Court, "[a] motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008).  The Second Circuit, however, recognizes an exception to that rule, permitting the district court to grant a Rule 50(b) motion even absent a properly-made Rule 50(a) motion if necessary to prevent "manifest injustice" or to correct "purely legal error." *Malmsteen v. Berdon, LLP*, 369 F. App'x 248, 249 (2d Cir. 2010) (citing *Fabri v. United Tech. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004)).

      Moolsan concedes that it failed to move pursuant to Rule 50(a) "for judgment as a matter of law during trial at any time prior to the submission of the case to the jury." *Galdieri-Ambrosini*, 136 F.3d at 286; (*see* Pl.'s Mem. at 14 n.2.)  This is fatal to Moolsan's Rule 50(b) motion.  *See United States v. Painting Known as Le Marche*, No. 06 Civ. 12994, 2010 WL 2229159, at *2 (S.D.N.Y. May 25, 2010) (declining to consider Rule 50(b) motion because "[c]laimant never made a Rule 50(a) motion during the course of this action"); *Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 451 F. Supp. 2d 576, 581 (S.D.N.Y. 2006) (same); *Rojas v. Theobald*, No. 02-CV-3623, 2007 WL 2455133, at *2 (E.D.N.Y. Aug. 23, 2007) ("a district court remains powerless to entertain a Rule 50(b) motion unless the movant has first requested judgment as a matter of law at any time before the case is submitted to the jury." (internal quotation marks omitted)).

      Moolsan contends that it "preserved" its ability to move for judgment as a matter of law because "Judge Holwell ruled on the only claim in this case, a breach of contract claim, . . . in the context of a Fed. R. Civ. P. 50 motion."  (Pl.'s Mem. at 14 n.2; *see also* Pl.'s Reply at 2.)  That the Court ruled on, and denied, a Rule 50(a) motion is true—the

6

Court granted in part and denied in part Manitou's Rule 50(a) motion made at the close of Moolsan's case; Moolsan, however, never made any such motion. (Trial Tr. at 223-33, 246-49); *see also Ho Myung Moolsan*, 2010 WL 4892646, at *1, *10-11. Moolsan also states that "[Moolsan] was ready to move for a directed verdict . . . but because the Court ruled on it, there was no need to 'move' to preserve the right for a post-trial motion." (Pl.'s Mem. at 14 n.2.) Moolsan provides no legal support for either contention; and indeed neither is the law. *See Fosamax*, 742 F. Supp. 2d at 469-70 (after denial of a party's Rule 50(a) motion, "*the moving party* may renew *its motion* for judgment as a matter of law under Rule 50(b) within 28 days of an unfavorable judgment" (emphasis added)); *Painting Known as Le Marche*, 2010 WL 2229159, at *2 (noting that a party cannot "implicitly" make a Rule 50(a) motion, but must make one in fact).[2]

Turning to manifest injustice or pure legal error, for the reasons discussed *infra* in conncetion with Moolsan's Rule 59(a) motion, the Court finds that Moolsan presents neither the manifest injustice nor the pure legal error necessary to warrant the granting of a Rule 50(b) motion absent a prior Rule 50(a) motion. Accordingly, the Court denies Moolsan's (renewed) motion for judgment as a matter of law under Rule 50(b).

**B. Motion for New Trial**

It is well established that "[i]n order for the Court 'to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence.'" *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 558

---

[2] It bears noting that the Court cannot read Moolsan's motion as arising under Rule 50(a), as opposed to Rule 50(b), as a Rule 50(a) motion must be made "*before* the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2) (emphasis added).

7

(S.D.N.Y. 2010) (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003)). The Court might also order a new trial if it finds that the trial was "unfair to the moving party [in that] substantial errors were made in admitting or excluding evidence, or in charging the jury, or [that] misconduct by counsel during the course of the trial cause[d] unfair prejudice to the moving party." *In re Vivendi Universal, S.A. Sec. Litig.*, ___ F. Supp. 2d ___, 2011 WL 590915, at *48 (S.D.N.Y. Feb. 17, 2011) (collecting cases). "The Rule 59 standard is less stringent than the Rule 50 standard for judgment as a matter of law in two respects: '(1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" *Id.* (quoting *Manley*, 337 F.3d at 244-45). "In weighing the evidence, however, the Court should not ordinarily ignore the jury's role in resolving factual disputes and assessing witness credibility." *Mugavero*, 680 F. Supp. 2d at 558-59 (internal quotation marks omitted).

Moolsan argues vociferously that the jury reached an erroneous result, and one that caused a miscarriage of justice, because (A) the jury concluded that Manitou had never received the allegedly unfilled purchase orders at issue, even as (B) Manitou admitted at trial to having received those orders. (*See* Pl.'s Mem. at 17-24; Pl.'s Reply at 3-10.) But at least for the Original Orders, the jury weighed the parties' conflicting evidence as to whether Manitou ever received the orders—and there was sufficient evidence to support the jury's finding that the Original Orders were not received, including Jhon and Kwon's testimony that Manitou never received them. (*See* Trial Tr. at 277-78, 390). In any event, for all purchase orders, including the Reorder, Moolsan

overlooks the second element of a claim for breach of an installment contract. The issue is not simply whether Manitou *received* Moolsan's orders; it is whether Manitou's defaults in filling those orders, if any, substantially reduced the value of those orders to Moolsan. The jury's verdict on that question was not against the weight of the evidence so as to warrant a new trial.

### 1. January, February, and March 2007 Purchase Orders

The parties' evidence and witnesses presented conflicting pictures at trial regarding the Original Orders. On the one hand, Moolsan's exhibits included "Merchandise Order Form[s]" on "Ho Myung America Inc." stationary for each of the Original Orders. (Pl.'s Trial Exs. 54D-H.) And Kim, Moolsan's president, testified at trial that Moolsan placed those orders, yet the orders went unfilled. (Trial Tr. at 125-26.) But at the same time, Jhon, Manitou's factory's production manager, and Kwon, Manitou's CEO, both testified that Manitou never received the Original Orders. (*Id.* at 277-78; 390.)

The Court will not order a new trial based on this alleged conflict. Resolution of the issue requires an assessment of witness credibility, and Moolsan does not and cannot point to "independent evidence in the trial record *clearly demonstrating* that, if a miscarriage of justice is to be avoided, [Manitou's] witnesses should not be believed." *Lewis v. City of New York*, 689 F. Supp. 2d 417, 425 (E.D.N.Y. 2010) (emphasis in original). "In those circumstances, the trial judge should accept the jury's findings, regardless of any doubts of his own in the matter." *Id*.

## 2. The Reorder

Unlike with the Original Orders, there was no dispute at trial that Manitou received Moolsan's June 5, 2007 Reorder for the eight containers of Water allegedly ordered in the unfilled Original Orders. Both Jhon and Kwon testified that Manitou received the Reorder and that Manitou confirmed its receipt with Moolsan. (Trial Tr. at 278, 306, 310, 406.) Yet the jury still provided a unanimous "No" answer to the Verdict Form's question of whether "[Moolsan] ha[d] proven by a preponderance of the evidence that [Manitou] defaulted in fulfilling [that Reorder], thereby substantially reducing the value to [Moolsan] of that shipment." (Verdict Form at 2.)

Moolsan argues that due to this discrepancy—that the Reorder was admittedly received but that Manitou failed to fill it—it was impossible for the jury not to find a breach of contract; and that because the jury did not so find, the Court must order a new trial. (Pl.'s Mem. at 19, 22; Pl.'s Reply at 8.) But Moolsan's argument misses the mark. The Contract at issue in this case was an installment contract. *Ho Myung Moolsan*, 2010 WL 4892646, at *3-4.[3] An installment contract contains a quantity term—unlike a requirements or output contract—but provides for delivery of goods in separate lots separately accepted. N.Y.U.C.C. 2-612(1); *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978, 981 (S.D.N.Y. 1985). A breach of the entire contract occurs only when a non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract. N.Y.U.C.C. 2-612(3); *Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc.*, 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995). Additionally, a breach of an individual installment occurs when the default in question substantially

---

[3] See *Ho Myung Moolsan*, 2010 WL 4892646, at *3-4, for a lengthier discussion of why the Court found the Contract to be an installment contract.

10

reduces or impairs the value, to the buyer, of that shipment.  *Arkla Energy Resources v. Roye Realty Developing Corp.,* 9 F.3d 855, 862-63 (10th Cir. 1993); 15 Williston on Contracts § 45:22.

      Manitou's entire theory of its case was that any failures of it to deliver Water—*i.e.* failures to fill Moolsan's orders—deprived Moolsan of no value whatsoever because Moolsan had no market for the Water in Korea, was not selling the Water, and could not sell it to begin with.  Indeed, this was the very first argument Moolsan's counsel made in his opening statement, and the very last argument he made in closing.  Counsel stated that that the case was not about any alleged failure to ship Water, but is instead about "a plaintiff who couldn't sell the water, didn't want the water, and all it ever sought in this case was to recover for a failed investment, which wasn't the defendant's responsibility." (Trial Tr. at 471; *see generally id*. at 13-19, 451-71; *see also* Def.'s Opp'n at 13-14.) Manitou's theory, in other words, was that *even if it did fail to fill orders*, those failures *did not* substantially reduce the value of each specific unfilled order.  Thus Moolsan's focus on whether or not it made and Manitou received any particular order, regardless of that assertion's disputability based on the evidence presented at trial, only addresses half of the question.

      The Court therefore turns to whether the evidence demonstrated that the value of the Reorder was substantially reduced by Manitou's apparent neglect of it.  Fatal to Moolsan's argument is that it completely failed to offer any documentary evidence establishing that it made even a single sale.  The Court's prior opinion of December 2, 2010 outlines the issue:

> Here plaintiff offered no documentary evidence establishing that it made
> even a single sale.  At the final pretrial conference the Court asked

11

> plaintiff's counsel no fewer than seven times for sales figures, revenue lines, or business ledgers. (Tr. of Hr'g of Oct. 21, 2010 at 32-35.) At best, plaintiff's counsel offered projections of sales. (*See id*. at 32.) Counsel additionally explained that bookkeeping standards and practices in Korea differ from United States standards. (*Id*. at 33.) However, to the Court's simple question of: 'What exhibit [does plaintiff] have that establishes the sale?' counsel answered, 'Judge, *I'm not able to specifically point to any document*.' (*Id*. at 34.) Furthermore, counsel continued to offer non-responsive answers to the Court's inquiries into (1) the markup from a $1 per bottle purchase price to a $15 resale price (in other words a markup of fifteen-hundred percent), and (2) the fact that other mineral water was selling in Korea for $0.60 to $1.10. Counsel stated that the sales price used by [Moolsan's expert] to calculate lost profits was, unsurprisingly, the plaintiff's sales price. (*Id*. at 38.) And counsel stated that plaintiff's water was priced twenty-five hundred to thirteen-hundred percent higher than other mineral water on the Korean market because its water was matched by 'no other water in the world.' (*Id*. at 37.) . . .
>
> . . .
>
> [Moolsan's Trial Exhibit 90A.14 at 1 ('Doc. 165')] was entitled 'Sales Plan' and contained a chart of sales numbers, broken down by month, from 2006 through 2010. (Doc. 165.) Because the chart extended at least three years after litigation began, at least the majority of it appeared to be projections or plans, and not records of sales actually made. . . .
>
> . . . Plaintiff's counsel conceded that [Moolsan's Trial Exhibit 90A.14 at 2 ('Doc. 167')] was a summary, prepared after litigation began, supposedly based on 'voluminous' sales documents that still existed in Korea. (Tr. of Trial at 104-06.) This admission was somewhat perplexing considering defense counsel's pre-trial requests, made at least twice in writing, for documents either establishing actual sales or going to plaintiff's damages calculation. (*See* Defendant's First Request For Production Of Documents dated Dec. 27, 2007 ¶ 36; Letter of Defense Counsel Michael J. Stacchini dated Sept. 3, 2008 ¶ 18.) *The 'voluminous' sales records, however, were never produced*. . . .

*Ho Myung Moolsan*, 2010 WL 4892646, at *8-10 (emphasis added).

Moolsan presented no documentary evidence indicating even a single sale of Water in Korea. Thus Moolsan's evidence as to how Manitou's failure to fill the Reorder—or any other order for that matter—reduces to the testimony of its witnesses

and specifically of its president, Kim. Kim testified that Moolsan, a new start-up company, expected to capture over twenty percent of the Korean mineral water market by a word-of-mouth marketing strategy "targeting the intelligent people," who would understand the benefits of Moolsan's "medicine water." (Trial Tr. at 142-43.) To achieve their sales goals, Kim testified, Moolsan would have to sell two one-liter bottles of Water to each buying household, at the Korean equivalent of $15 per bottle,[4] every day, for months on end. (*Id*. at 141-44.) Kim also testified that, of the about 300,000 bottles of Water actually received, Moolsan disposed of the entire stock by selling it or giving it away in promotional efforts. (*Id*. at 144-47.) But in her deposition, which was read to the jury, Kim admitted that Moolsan retained no marketing firm to create sales and profits projections, but instead formed sales projections solely from the reports of its salespeople in the field and customer testimonials. (*Id*. at 151-53.)[5] Kim also admitted that about half of the 300,000 original stock of bottles was given away for free. (*Id*. at 146-47.)

This testimony constituted the only evidence regarding resale of the Water in Korea, and therefore value of the Water to Moolsan. Based on it, and without any documentary evidence confirming a single sale, the jury was entitled to believe that Moolsan was not selling and could not sell the Water. Indeed, at a minimum, the jury's verdict to that effect was not "against the weight of the evidence" as is required on a Rule

---

[4] Moolsan purchased the Water from Manitou at $1 per bottle. (Contract ¶ 5; Trial Tr. at 154.) In addition, Moolsan submitted evidence with its expert report indicating that other mineral water was selling in Korea for between $0.60 and $1.10 per bottle, which is far less than the $15 Moolsan alleges it charged. *See Ho Myung Moolsan*, 2010 WL 4892646, at *8.

[5] Kim testified at trial and the deposition testimony was inconsistent with her evasive answer, "[i]t's different," to Manitou's counsel's question whether Moolsan had given away half of the 300,000 bottles for free. Thus the testimony is not hearsay and is admissible for its truth. Fed. R. Evid. 801(d)(1)(A); *Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001) (Prior inconsistent statements . . . are inadmissible hearsay for substantive purposes unless they were made at a trial, hearing, or other proceeding, or in a deposition.").

59(a) motion. *Mugavero*, 680 F. Supp. 2d at 558; *see also Arkla Energy*, 9 F.3d at 862 (affirming district court's ruling, after bench trial, that value of installments not substantially impaired by non-delivery, and therefore buyer not entitled to recover undelivered installments' value, when time of delivery not of the essence and plaintiff could not show damages from default); *Kirkwood Agri-Trade v. Frosty Land Foods Int'l, Inc.*, 650 F.2d 602, 605 (5th Cir. 1981) (affirming district court's denial of any damages for breach of individual installment because buyer covered in market for less than contract price and therefore sustained no injury, *i.e.* no impairment to value of installment). Other than Kim's testimony on direct examination, Manitou is correct that "the record is devoid of any evidence that [Moolsan] lost a single sale or a single customer due to any purported intermittent delay in any of the shipments." (Def.'s Opp'n at 13.) Accordingly, the jury's verdict that Manitou did not default in filling the Reorder, thereby substantially reducing the value to Moolsan of the Reorder, does not require a new trial, and the Court will not order one.

### 3. The Verdict Constituting a "Punitive Award"

Moolsan's final argument on this point is that, since it paid $1.5 million and yet received only 300,000 bottles of Water, the jury's verdict finding for Manitou on all issues of liability is a "punitive award[] that [is] 'so high as to shock the judicial conscience.'" (Pl.'s Mem. at 24 (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)).) But this is a mischaracterization of the jury's verdict. The jury did not grant Manitou any damages, punitive or otherwise. It declined to find Manitou liable, which operated as a denial, to Moolsan, of a recovery of its investment. These two concepts,

14

however, are different.  By way of example, the legion of opinions in this District dismissing securities fraud cases do not operate as punitive damages awards for defendants simply because plaintiffs were not entitled to recover the funds they invested and might have lost.  *Cf.* Black's Law Dictionary (9th ed. 2009) (defining punitive damages).  Here, the jury found that Moolsan's investment loss was not caused by any delays in filling the relevant orders and, therefore, that Moolsan failed to prove any impairment in value of any installment.

### C.  Disgorgement

In addition to moving for judgment as a matter of law and for a new trial, Moolsan "invoke[s] this Court's sense of equity and fairness," (Pl.'s Reply at 13), and requests that the Court order a refund to Moolsan of (1) the money it pre-paid Manitou for Water less the contractual value of the Water received; and (2) an appropriate percentage of the money it paid Manitou for the right to sell the Water.  (Pl.'s Mem. at 25-27.)  Moolsan labels this request as one for "disgorgement," which is required to otherwise prevent a "forfeiture" of its payments.  (*Id.*)

The Court denies Moolsan's request for three reasons.  First, Moolsan cites no legal authority even supporting the Court's ability to make such an order.  Second, Moolsan here is essentially attempting to recast its breach of contract claim, or the theme of its case, in alternate legal or equitable theories.  Disgorgement is commonly the resulting court order should a plaintiff win on a claim of unjust enrichment.  *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 421 (S.D.N.Y. 2010).  But Moolsan did not invoke unjust enrichment or any theory other than breach of contract at trial, and

15

therefore the arguments are waived. *See Watson v. E.S. Sutton, Inc.*, 225 F. App'x 3, 4 (2d Cir. 2006). Finally, the cases Moolsan cites for the proposition that "[f]orfeitures are generally disfavored in the law," (Pl.'s Mem. at 26), are off-point, unconvincing, and do not, at all, indicate that the Court should order "disgorgement" in this situation. *See Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 843-44 (2d Cir. 1975) (noting that judicially-ordered forfeitures are disfavored by equity, but affirming district court's forfeiture judgment because the forfeiting party had "unclean hands."); *Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 435-36 (S.D.N.Y. 2001) (denying plaintiffs' argument that a certain contractual provision operated as a forfeiture, "abhorrent to New York law," because defendants' stock repurchase rights at issue were clearly and unambiguously stated in the contract); *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 248 (N.Y. 1992) (enforcing contract despite requiring forfeiture of assets upon default of a certain loan because neither law nor public policy counseled otherwise). Here the Court has ordered no forfeiture and the verdict contains no such order; thus these cases are inapposite. And to the extent that Moolsan is arguing that the verdict was simply inequitable, that argument fails for the reasons already discussed in this opinion. Accordingly, the Court denies Moolsan's request for post-verdict disgorgement.

### D. Sanctions

Finally, Moolsan alleges that Manitou and its counsel committed a fraud on the Court and moves for sanctions on two grounds. First, Moolsan argues that Manitou's counsel asserted contradictory positions by (1) defending against Moolsan's motion for a

preliminary injunction on October 22, 2007, in part by confirming that Manitou's factory was not, on that date, producing Water and selling it to third parties; but (2) alleging at trial that, in August 2007, Manitou had offered to ship Moolsan water. (Pl.'s Mem. at 29.) Second, Moolsan argues that Manitou's counsel's October 22, 2007 statements were directly contradicted by Kwon's trial testimony that Manitou's factory was producing Water at that time. (*Id*.)

Moolsan does not identify any "sanction" that it requests[6] other than that the Court enter judgment for Moolsan or else instruct the jury, at a future new trial, that Manitou's counsel presented contradictory positions in the past. (Pl.'s Reply at 15.) In any event, the Court finds that Moolsan entirely mischaracterizes the highlighted "fraud," which does not, in reality, present the inconsistencies claimed.

First, at the October 22, 2007 hearing, what Manitou's counsel actually stated was that while the factory was not then making Water, it was prepared to do so, and that Manitou had in fact offered to ship Water but that Moolsan had elected to pursue litigation. (Oral Arg. Tr. at 10-13.) If anything, this contention is consistent with counsel's trial statement that, in August 2007, two months prior, Manitou had offered to ship Water. In addition, even if the statements were inconsistent, Moolsan's contention that "this Court declined to grant injunctive relief in the apparent view that the factory was not operating," (Pl.'s Mem. at 29), is incorrect. Far more important to the Court's decision was Moolsan's odd insistence on a preliminary injunction when "[Moolsan was] here saying, Judge, we want all the water they produce, and [Manitou was] in court saying, we will give you all of the water that we produce." (Oral Arg. Tr. at 15.)

---

[6] Indeed, Moolsan's counsel states, in his declaration, that "[i]t is difficult to envision what sanction is appropriate, but plaintiff must invoke this court's sense of fair play and equity in this matter." (Liu Decl. ¶ 5.)

17

Second, Kwon's testimony at trial, answering "yes," to the question, "in late 2007, was the factory producing water and selling to third parties?" occurred in the middle of a confused interaction between Moolsan's counsel and Kwon during which the Court specifically noted a translation problem involving the words "operating" and "operable." (*See* Trial Tr. at 411-15.) In context, Kwon's answer is better read as admitting that the factory could produce Water in August 2007, and denying that Manitou refused to ship Water in September or October 2007, explaining instead that Moolsan had refused Manitou's offers to ship. (*Id*. at 413, 415.) Again, if anything this is consistent with Manitou's counsel's statement in October 2007 that Manitou was ready and willing to ship Water, but that Moolsan would not accept any.

Moolsan finally argues that Manitou should have been judicially estopped from taking, at trial, a position inconsistent with the position it took in defending against Moolsan's preliminary injunction motion. (Pl.'s Mem. at 29.) "Typically, judicial estoppel will apply if: 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)). The Second Circuit "further limit[s] judicial estoppel to situations where the risk of inconsistent results [impacting] judicial integrity is certain." *Id*. As the Court has explained, however, Manitou's positions were not "clearly inconsistent." Moreover, this is an argument Moolsan should have raised during or before trial, and as such it is now waived. *Papakosmas v. Papakosmas*, 483 F.3d 617, 624 n.3 (9th Cir. 2007); *Beall v.*

*United States*, 467 F.3d 864, 870 (5th Cir. 2006). Accordingly, the Court denies Moolsan's post-verdict motion for sanctions.

### III. CONCLUSION

For the reasons stated above, the Court denies Moolsan's motion for judgment as a matter of law and other post-verdict relief **[162]** in its entirety. The Clerk of the Court is directed to close this motion.

SO ORDERED.

Dated: New York, New York
June **6**, 2011

Richard J. Holwell
United States District Judge

19